

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOE KING,
      Petitioner         :

                    :

                    :

                    :

      vs.            :      CIVIL ACTION NO. 1:CV-00-1389

                    :      (Judge Rambo)

                    :

RAYMOND COLLERAN, Superintendent, :
and ATTORNEY GENERAL OF       :
PENNSYLVANIA,            :
         Respondents     :

**APPENDIX**

FILED
HARRISBURG

NOV 2 1 2000

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

Francis T. Chardo
Chief Deputy District Attorney
Dauphin County Courthouse
Front & Market Streets
Harrisburg, Pennsylvania 17101
(717) 255-2770

## INDEX TO APPENDIX

APPENDIX "A"

       TRANSCRIPT OF EVIDENTIARY HEARING
       APRIL 23, 1999


APPENDIX "B"

       OPINION OF THE HONORABLE JOSEPH H. KLEINFELTER
       DATED JULY 16, 1999


APPENDIX "C"

       APPELLANT'S BRIEF TO THE SUPERIOR COURT OF
       PENNSYLVANIA

APPENDIX "D"

       OPINION OF THE SUPERIOR COURT OF PENNSYLVANIA
       DATED APRIL 27, 2000

**APPENDIX "A"**

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
                                :              OF
                                : DAUPHIN COUNTY, PENNSYLVANIA
                                :
             VS.                   :
                                : **Post-Conviction Relief**
                                : **Act**
                                :
JOHN FLEMMING A/K/A           :
JOE KING                      : NO. 1173 C.D. 1995

### TRANSCRIPT OF PROCEEDINGS

### **EVIDENTIARY HEARING**

RECEIVE

NOV 3 0 1999

DISTRICT ATTORNEY'S
OFFICE
DAUPHIN COUNTY

BEFORE:      THE HONORABLE JOSEPH H. KLEINFELTER

DATE:       FRIDAY, APRIL 23, 1999
                10:30 O'CLOCK A.M.

PLACE:      COURTROOM NO. 5
                DAUPHIN COUNTY COURTHOUSE
                HARRISBURG, PENNSYLVANIA

A P P E A R A N C E S:

    JEFFREY B. ENGLE, ESQUIRE
    Deputy District Attorney
      For - Commonwealth

    FRANCIS M. SOCHA, ESQUIRE
      For - Defendant



2

1          **INDEX TO WITNESSES**

2

3     FOR THE PETITIONER          DIRECT   CROSS   REDIRECT

4     JOHN D. FLEMMING               7      15      23

5

6

7

8

9

10

11

12

13

14

15

16    FOR THE COMMONWEALTH        DIRECT   CROSS   REDIRECT

17    MICHAEL E. DUDA               24      44      54

18

19

20

21

22

23

24

25

3

## INDEX TO EXHIBITS

| FOR THE PETITIONER | MARKED | ADMITTED |
|---|---|---|
| 1 | 45 | 62 |
| 2 | 45 | 62 |

| FOR THE COMMONWEALTH | MARKED | ADMITTED |
|---|---|---|
| 1 | 31 | 62 |
| 2 | 33 | 62 |

4

<u>FRIDAY, APRIL 23, 1999</u>

3        (The following proceedings occur at 10:30 a.m.:)

MR. ENGLE:  Good morning, your honor.

May it please the court, commonwealth calls docket 1173 C.D. 1995, Commonwealth vs. John Flemming, also known as Joe King.

This is the time and place scheduled for an evidentiary hearing on a PCRA matter initially filed by the petitioner and appointed counsel, Mr. Socha, who then, thereafter, filed an amended petition.  The defendant is present in court today with Mr. Socha.

Your honor, the issues raised by the petitioner are, first, with regard to the direct appeal.  He is claiming that Mr. Duda, his trial counsel, was ineffective for having failed to take a direct appeal.

Second --

THE COURT:  Isn't that the only real issue?

MR. ENGLE:  Well, no.  There is another issue regarding the testimony of Ida Foltz.

Miss Foltz was a witness to this crime.

THE COURT:  Let me see if I can state this:  There was no direct appeal.  All of the underlying issues as to what happened at trial, like what happened to Ida Foltz and how she

5

1   was examined; the Rule 1100 issue; was I right or wrong in

2   denying the Rule 1100 issue?

3          I think that the stage we're in right now is since

4   none of those items were pursued on a direct appeal, they're

5   all -- you start with the fact that they're all waived.  So

6   the only issue is whether or not there should have been an

7   appeal.

8          Now, these other issues are subsumed in that, but

9   they're not separate issues, if you follow me.

10         MR. ENGLE:  The only concern that I have,

11  your honor, is that should this court, whatever its decision

12  would be after hearing with regard to whether an appeal nunc

13  pro tunc should be granted, is that if this goes up on appeal

14  and is ultimately remanded or he is allowed to do an appeal

15  nunc pro tunc, and the issues on direct appeal, if you would,

16  would be was trial counsel ineffective for having failed to

17  object to Miss Foltz's testimony about a PFA?  And as a matter

18  of fact, after that he cross-examined her about it.

19         They would probably remand for an evidentiary

20  hearing to determine whether he was ineffective on that issue,

21  so--

22         THE COURT:  Where is trial counsel?

23         MR. ENGLE:  Mr. Duda is here.

24         THE COURT:  Hiding behind you there.

25         MR. ENGLE:  I thought we could save some time and

6

1    maybe waste -- not waste the court's resources on having this

2    matter come back again if, in fact, it ever would.

3              THE COURT:  Well, just so you understand, though,

4    that I do think that we are not in a conventional PCRA issue

5    where we look immediately at what counsel should have done at

6    trial, as much as we are whether or not counsel should have

7    taken an appeal.  Maybe you look at those as one and the same

8    issue.  But I think, at least, procedurally there is a

9    distinction.

10             All right.  Well, I understand.  I've read the

11   petition.  I read your answer, so I understand what the basic

12   issues are here.  Failure of him to appeal the dismissal of

13   Rule 1100; failure of him to challenge the sufficiency of the

14   evidence; failure of him to object to Ida Foltz's testimony at

15   trial; and then his ineffectiveness in his cross-examination

16   of Ida Foltz which elicited the fact of a PFA.

17             Aren't those the four areas?

18             MR. ENGLE:  I believe so, your honor.

19             MR. SOCHA:  Yes, your honor.

20             THE COURT:  Now, the burden of showing that a direct

21   appeal should have been taken is upon whom?

22             MR. SOCHA:  By the petitioner.

23             We're ready to proceed, your honor.

24             THE COURT:  Go ahead.

25             MR. SOCHA:  Mr. Flemming.

7

1                  J O H N   F L E M M I N G,

2   called as a witness, being duly sworn, testifies as follows:

3

4                    <u>DIRECT EXAMINATION</u>

5   BY MR. SOCHA:

6         Q    Would you please state your name for the record?

7         A    John Flemming.

8         Q    You're also known as Joe King?

9         A    Joe King.

10        Q    Okay.  Would you prefer me to call you

11   Mr. Flemming?  Is that your legal name?

12        A    Yes.

13        Q    Mr. Flemming, where are you presently incarcerated?

14        A    At SCI Waymart.

15        Q    What sentence are you serving there?

16        A    8 to 20.

17        Q    On what charge?

18        A    Aggravated assault.

19        Q    That's the charge which we're here for today?

20        A    Yes.

21        Q    Who was your attorney during trial?

22        A    Michael Duda.

23        Q    I'm going to direct your attention immediately after

24   the jury verdict, when the jury came in and rendered a verdict

25   of guilty.

8

1          Do you remember that?

2     A    Yes.

3     Q    And that was specifically on March 12, 1996.

4          Did you have any conversations with Mr. Duda after

5     the jury's -- guilty verdict pertaining to an appeal?

6     A    Yes.  I told Mike I wanted to appeal the finding of

7     guilty.

8     Q    Where did this conversation take place?

9     A    Right where you're sitting at.

10         THE COURT:  I didn't hear you.

11         THE WITNESS:  I said right where he's sitting at.

12

13    BY MR. SOCHA:

14    Q    For the record, the table where I'm sitting?

15    A    Yes.

16    Q    Do you recall what you specifically said to

17    Mr. Duda?

18    A    Mr. Duda said he would come and see me.

19    Q    When the jury verdict came in, you were still out in

20    the street?

21    A    No.  I was out in the Dauphin County Prison prior to

22    being found guilty, and after being found guilty by the jury,

23    then I made bail.

24    Q    You made bail after the verdict?

25    A    Yes.

DAUPHIN COUNTY COURT REPORTERS

1      Q    Okay. After the verdict and before sentencing which

2  occurred on May 16, 1996, did you have any conversations with

3  Mr. Duda?

4      A    Yes.

5      Q    Where did those conversations take place?

6      A    Right there at the table where you sitting.

7      Q    Let me make sure you understand this question.

8      After the verdict came in and after you were

9  released on bail and before you were sentenced, did you have

10  conversations with Mr. Duda regarding any further appeal?

11      A    The only conversation I had with him was at that

12  table.

13      Q    And that was at the time of the jury verdict?

14      A    Yes.

15      Q    Now, you were sentenced on May 16th?

16      A    Right.

17      Q    And at that time you were incarcerated; is that

18  right, prior to being sentenced?

19      A    Right.

20      Q    Because a capias had been issued?

21      A    Yes.

22      Q    Did you have any conversations with Mr. Duda after

23  sentencing on May 16th regarding a further appeal of your

24  conviction to the Superior Court?

25      A    Like I said, I sat at that table there after I got

1    sentenced, and I told him I wanted to appeal the sentencing.

2            He told me he was coming out the county to see me.

3        Q    Immediately after sentencing were you then taken to

4    Dauphin County Prison?

5        A    Yes, I was.

6        Q    How long did you remain at Dauphin County Prison

7    after May 16, 1996?

8        A    Three days, I think.

9        Q    Where did you go after you were transferred from

10   Dauphin County?

11       A    SCI Camp Hill.

12       Q    And did Mr. Duda ever come out to see you at Camp

13   Hill?

14       A    No.

15       Q    Did you have any conversations with Mr. Duda while

16   you were in Camp Hill?

17       A    No.

18       Q    Do you recall when Judge Kleinfelter sentenced

19   you --

20       A    Yes.

21       Q    -- on May 16th, that he gave you -- he advised you

22   of certain sentencing rights?

23       A    Yes.

24       Q    Do you specifically remember being advised of the

25   right that you had 30 days to file an appeal from the date of

11

1    sentencing?

2        A    Yes, I did.

3        Q    What was your understanding as to what was going to

4    happen in regards to an appeal after May 16, 1996?

5        A    My understanding from making the statements to

6    Mr. Duda about I wanted an appeal was that he was going to

7    appeal for me.

8        Q    Now, we've been up to the point where as of May 20,

9    1996 you were in Camp Hill?

10       A    Yes.

11       Q    And you testified you had no conversations with

12   Mr. Duda nor did he come out to see you while you were at

13   Camp Hill; is that correct?

14       A    Yes.

15           THE COURT:  Excuse me.

16           Am I also to understand he never went to see him

17   during the three days that he was at DCP?

18           THE WITNESS:  That's correct.

19           THE COURT:  All right.

20

21   BY MR. SOCHA:

22       Q    How long did you remain at Camp Hill before you were

23   transferred again?

24       A    I think it was 50-some days.

25       Q    Where were you transferred to?

12

1      A    To SCI Albion.

2      Q    The 30-day period of sentencing would have expired

3  when you were incarcerated at Camp Hill; is that correct?

4      A    Yes.

5      Q    At some point in time did you -- were you able to

6  communicate or to speak to Mr. Duda regarding an appeal?

7      A    One time.

8      Q    When was that?

9      A    I called from Albion to the Public Defender's

10  Office.

11      Q    This is a phone conversation?

12      A    Yes.

13      Q    And you spoke to Mr. Duda?

14      A    Yes.

15      Q    And what was your -- what did you say to Mr. Duda?

16      A    I wanted to know what was happening with the

17  appeal.  I thought I should have heard something by then or

18  got a copy of something.

19      Q    And do you have an approximate date as to when this

20  conversation occurred?

21      A    The first part of September.  I couldn't tell you

22  the exact date.

23      Q    September of what year?

24      A    '96.

25      Q    And Mr. Duda's -- what was Mr. Duda's response to

13

1   your inquiry?

2       A     That it take time, you know.   The process take

3   time.   That's going to happen.

4       Q     What was your impression with Mr. Duda's comment?

5   What did you determine the status of the appeal was by what he

6   said to you?

7       A     Just wait a little longer; be patient and just wait.

8       Q     Did you believe the appeal had been filed?

9       A     Yes.

10      Q     At some point in time did you discover that an

11  appeal had, in fact, not been filed in your case?

12      A     Yes.

13      Q     What were the circumstances under which you found

14  that out?

15      A     I wrote to the Clerk of Courts and asked for the

16  final disposition of my docket, and he sent me a copy of my

17  docket entry sheet.

18      Q     And what did you discover upon receiving a copy of

19  the docket entry?

20      A     The question I asked the Clerk of Courts he pointed

21  out.   He said, You can see no further action has been taken in

22  your case; no petition or any action.

23      Q     What was your response then after having discovered

24  that information that an appeal had, in fact, not been filed

25  in your case?

14

```
1        A    I wrote a letter to Mr. Shultz of the Public

2   Defender's Office, and I wrote one to Mr. Duda.

3             Then I sent another one back to the Clerk of Courts.

4        Q    What was the purpose of these letters to Mr. Shultz

5   and Mr. Duda?

6        A    I wanted to know if he was still my lawyer and why

7   hadn't anything been done as far as an appeal.  I was under

8   the impression that I had an appeal.

9             And I got no response, so I filed a nunc pro tunc

10  and sent it.

11       Q    Sorry.  Would you repeat that?

12       A    I filed a nunc pro tunc.

13       Q    Nunc pro tunc?

14       A    Yes.

15       Q    And did you do that on your own?

16       A    Yes.

17       Q    What was the purpose for which you did that?

18       A    Because I wanted to get my appellate rights back.

19       Q    And do you recall on or about when you, in fact,

20  filed this appeal nunc pro tunc?

21       A    It happened January of '97 and -- yeah, January of

22  '97 somewhere.  I can't tell you the exact date, but it was

23  in January.  I think it was in '97, because I had to do a lot

24  of research to find out how to get back to court.

25       Q    Was that appeal ever filed or lodged?
```

15

1          A     What I did, I sent it to the Clerk of Courts and

2     sent one to the Public Defender's Office.  The clerk told me

3     everything had been forwarded to the counsel of record.

4          Q     All right.  And at some point in time you did file a

5     Post-Conviction Relief Act Petition; is that correct?

6          A     Yes.

7               MR. SOCHA:  I have no further questions.

8               MR. ENGLE:  Court's indulgence.

9

10                    (There is a pause.)

11

12                    CROSS-EXAMINATION

13     BY MR. ENGLE:

14          Q     Mr. King, I believe I heard you testify that you

15     were -- you made bail after you were found guilty?

16          A     Yes.

17          Q     Okay.  Wasn't your bail, in fact, increased from

18     $5,000 to $50,000?

19          A     (There is no response.)

20          Q     After you were convicted, wasn't your bail, in fact,

21     increased to $50,000?

22          A     Yes.

23          Q     Okay.  And is it your testimony that you didn't go

24     to Dauphin County Prison on that date?

25          A     No -- wait a minute.  It was --

16

1    Q    Okay.  Let me back up for a moment.

2         Your trial -- this incident occurred on January 31,

3    1995.  Your initial bail that you posted was $5,000, correct?

4    A    Mm-hmm.

5    Q    Yes?

6    A    Yes.

7    Q    Okay.  Your trial was March 11 through March 12,

8    1996?

9    A    Yes.

10   Q    And after the jury's verdict was rendered, your bail

11   was increased to $50,000.

12        Do you recall that?

13   A    Right.

14   Q    Did you go to jail, to DCP, on that date?

15   A    Yes.

16   Q    So you were in DCP immediately after your trial?

17   A    Yes.

18   Q    And did you have any discussions with Mr. Duda after

19   the guilty verdict was rendered with regard to an appeal?

20   A    Yes.

21   Q    Okay.  How would you characterize your relationship

22   with Mr. Duda after the jury verdict was rendered?

23   A    Well -- well, he asked the court if there was --

24   grant me bail again.

25   Q    I'm sorry?

1      A    He asked the court if they would grant me bail, and

2    I talked to him about the appeal.  That was it.  And he gave

3    me bail.

4      Q    How would you characterize your personal

5    relationship with Mr. Duda after the jury verdict was

6    rendered?

7      A    Not -- none.

8      Q    You had no relationship?

9      A    No.

10     Q    Didn't you, in fact, want to sue Mr. Duda?

11     A    Did I?

12     Q    Yes.

13     A    Yes.

14     Q    And, in fact, in the PCRA petition that you filed on

15   March 13, 1996, which was dismissed as untimely because it was

16   before you were sentenced, you had indicated that you wanted

17   to sue Mr. Duda; is that correct?

18     A    No, no, no.  I don't understand what you're saying

19   now.

20     Q    Okay.  Your relationship with Mr. Duda after the

21   trial, after March 12th, after you were found guilty, you said

22   you didn't have a relationship?

23     A    No.  An attorney/client relationship?  No.

24     Q    My question to you is, isn't that, in fact,

25   incorrect that your relationship -- at that point there was

18

1   some animosity there?

2         A    No, I wouldn't say that.

3         Q    There was no animosity?

4         A    No.

5         Q    Do you recall having filed a pro se PCRA petition on

6   May 13, 1996?

7         A    May 13, 1996?    No, I didn't.

8         Q    You did not?

9         A    No.

10              MR. ENGLE:   Your honor, if I may approach the

11   witness?

12              Could I have this marked as Commonwealth Exhibit 1?

13              THE COURT:   We can take judicial notice of anything

14   that's filed of record.

15              MR. SOCHA:   Is that of record?

16              MR. ENGLE:   Yes I just wanted to point out some

17   specific things in there and maybe ask him --

18              THE COURT:   The point I'm making with you is you can

19   do that.   You first ask the court to take judicial notice of

20   that document.   I do that.

21              Then you confront him with it, and you can do all of

22   that without having it marked as an exhibit.

23              MR. ENGLE:   I apologize, your honor.

24              Would the court take judicial notice of the

25   Defendant's Pro Se PCRA Petition that was filed May 13, 1996?

19

1    I'll supply the court with a copy of it, of course.

2              THE COURT:  Thank you.

3              Any objection?

4              MR. SOCHA:  No objection.

5              THE COURT:  All right.  I will take notice of this

6    document.

7              MR. ENGLE:  Thank you, your honor.

8

9    BY MR. ENGLE:

10       Q    Mr. Flemming, if I may, I'd like to show you a

11   document that is labeled Motion for Post-Conviction Collateral

12   Relief, and there is a stamp on there that indicates it was

13   filed May 13, 1996.

14       A    Mm-hmm; I remember that.

15       Q    You do remember that?

16       A    Yes.

17       Q    So you did file a pro se PCRA petition?

18       A    Yes.

19       Q    Prior to sentencing?

20       A    Just to try to get another attorney.

21       Q    Okay.  And would you turn with me to Page 5 there in

22   that document?  At Paragraph 10 where it indicates that you

23   want to sue Mike Duda; to have him removed from your case?

24       A    No, I wanted to have him removed from my case.  I

25   didn't say -- specify I had, that word is there, but it's not

20

1    indicated I wanted to sue him to have him removed.

2              I wanted to have him removed from my case because he

3    wasn't doing anything.  Not to sue like financially, no, not

4    at that time.  I wanted to have him removed from my case

5    because he wasn't responding like he was my lawyer.  Even

6    though he talked to me-- I stay out the county for eight

7    months and he came to see me one time just before the day of

8    court.

9         Q    Okay.  Had you, in fact, retained other counsel?

10        A    I tried to.

11        Q    Okay.  Well, in your -- turn to Page 6 for me, would

12   you?

13             Is that your signature at the bottom there?

14        A    Yes.

15        Q    Assume there at the top paragraph portion there at

16   subaverment B that indicates you are represented by a lawyer?

17        A    I was trying to get this lawyer to represent me, but

18   I never got in touch with him after I left the county.

19        Q    So what you're indicating here is that that is not,

20   in fact, correct; that you were not represented by another

21   attorney?

22        A    No.  I was requesting to be represented by another

23   attorney.  That's the reason I gave that.  At the time I did

24   not understand it.

25             That's the way I wanted it done, and I didn't

21

1  understand how to do it because I had never done it before.

2     Q    Well, you read and write the English language; is

3  that correct?

4     A    I understand English.

5     Q    And I am represented by a lawyer.

6          Does that mean I am seeking to be represented by a

7  lawyer, I wish to be represented by a lawyer, or I am

8  currently represented by a lawyer?

9          What does that mean to you?

10    A    It means that I am represented by a lawyer.

11    Q    Okay.  And you have a name there?

12    A    Yeah, I have a name there.

13    Q    And you signed that declaration under penalty of the

14  law?

15    A    Excuse me.  But I knew I couldn't get this lawyer

16  unless Mr. Duda had resigned from my case.  I couldn't have

17  both of them.

18    Q    Did you ever communicate with Mr. Duda at all?

19    A    He wouldn't come see me.

20    Q    Mr. Flemming, you were convicted of robbery in 1991,

21  correct?

22    A    No.

23    Q    Theft?

24    A    Yes.

25    Q    1991?  October 14, 1991?

22

1       A    Yes.

2            MR. SOCHA:  Just for the record, I assume that

3    question is being answered for the purposes of --

4            MR. ENGLE:  Correct.  We're not in a jury trial.

5

6    BY MR. ENGLE:

7       Q    Do you have any copies of letters that you sent to

8    either Mr. Duda or Mr. Shultz regarding the status of your

9    appeal?

10      A    No.

11      Q    You do have the address to the Public Defender's

12   Office, do you not?

13      A    Yes.

14      Q    Yes?

15      A    Yes.

16      Q    At the time of sentencing you were given certain,

17   what are known as post-sentencing rights by the trial court.

18           Do you recall that?

19      A    Yes.

20      Q    And you understood those time restrictions, did you

21   not?

22      A    Yes.

23      Q    Did you at any point after those rights were read

24   communicate to Mr. Duda that you, in fact, wanted a direct

25   appeal taken?

1     A    Yes, I did.

2         MR. ENGLE:  I have nothing further, your honor.

3         THE COURT:  Any redirect?

4

5                  <u>REDIRECT EXAMINATION</u>

6  BY MR. SOCHA:

7     Q   It's my understanding then that you said you

8  communicated to Mr. Duda that you wanted an appeal?

9     A    Yes.

10     Q    Where did you do that again?

11     A    Sitting right at that table there (indicating), and

12  once at Albion.  I called at Albion.

13     Q    It was your impression an appeal had, in fact, been

14  filed?

15     A    Yes.

16         MR. SOCHA:  Nothing further.

17         MR. ENGLE:  Nothing further, your honor.

18         THE COURT:  You may step down.

19

20           (The witness is excused.)

21

22         MR. SOCHA:  We have no further evidence, your

23  honor.

24         MR. ENGLE:  Your honor, I'll call Mr. Duda to the

25  stand.

24

M I C H A E L    E.    D U D A,

called as a witness, being duly sworn, testifies as follows:


### DIRECT EXAMINATION

BY MR. ENGLE:

Q    Mr. Duda, can you please state your name for the record?

A    My name is Michael Duda, D-U-D-A.

Q    How are you currently employed?

A    I'm self-employed as an attorney.

Q    Were you employed with the Public Defender's Office prior to that?

A    Yes, I was.

Q    And did you work for the Public Defender's Office in May of 1996?

A    Yes, I did.

Q    And were you assigned to represent the petitioner, Mr. Flemming?

A    Yes, I was.

Q    Okay.  And you, in fact, represented him at trial?

A    That's correct.

Q    With regard to the issue of direct appeal, did you have any discussions with Mr. Flemming after the verdict had been read about a direct appeal?

A    I don't recall having any discussions with

25

1    Mr. Flemming at that point about filing a direct appeal or any

2    type of appeal.

3        Q    Do you recall seeing him at the prison at all after

4    the verdict had been entered and his bail had been raised?

5        A    No.

6        Q    Did you see him -- did you see and speak to him

7    after he was sentenced on May 16, 1996?

8        A    I don't believe I did.

9        Q    Did he ever communicate to you after his

10   post-sentencing rights were read to him in court that he

11   wanted you to pursue a direct appeal for him?

12       A    Are you talking either orally or written

13   communications?

14       Q    Orally or written.

15       A    I don't recall Mr. Flemming ever talking to me

16   orally over the phone or calling me with regard to filing any

17   appeal in his case.

18       Q    Did you ever receive a telephone call from

19   Mr. Flemming at your office after the sentencing had occurred

20   regarding status of his direct appeal?

21       A    I don't recall -- I don't recall any type of

22   telephone call from Mr. Flemming or any message that

23   Mr. Flemming had called me.

24            My practice has been to -- especially with regard to

25   after a client has been found guilty and sentenced -- any

26

1    telephone message goes automatically into the file.

2        Q    Did you look through your file prior to testifying

3    today?

4        A    Yes, I did.

5        Q    Do you have any indications as to that?

6        A    There were no telephone messages in the file from

7    Mr. Flemming.

8        Q    Okay.

9        A    I should also note that even if there was not a

10   telephone message in the file, which my practice is to put

11   every documentation in the file, even if Mr. Flemming would

12   have called me, I would have taken the call directly or I

13   would have gotten back to Mr. Flemming within a reasonable

14   period of time.

15       Q    In your practice as an attorney -- how long did you

16   work for the Public Defender's Office?

17       A    Eight years.

18       Q    In your practice as a public defender for eight

19   years, would you typically file a direct appeal if you

20   perceived issues of merit, regardless of the communications

21   with the defendant?

22       A    Yes.  If -- either with regard to a sentence that I

23   thought was unreasonable or not supported by the guidelines, I

24   would have filed an appeal with regard to the sentence.  Or if

25   there was even a scintilla of an argument concerning

27

1    sufficiency of the evidence or some type of other grounds for

2    appeal, then I would do that just to protect -- even if I had

3    not talked to the client -- to protect his rights, knowing

4    there are certain time limitations within which to file an

5    appeal with regard to sentencing and with regard to filing an

6    appeal for other grounds.

7         THE COURT:  Excuse me.  Let me just follow that

8    lineup with the converse inquiry.

9         On the other hand, would you have filed an appeal

10   solely on the demand of a client where you thought there were

11   no appeal issues?

12        THE WITNESS:  My practice in that situation would --

13   I would talk to the client.  I wouldn't just disregard what he

14   said.

15        If he said, Mr. Duda, I want an appeal, and I think

16   to myself he has no basis for an appeal, I would have at least

17   given the client a courtesy if he was in Dauphin County Prison

18   or in Camp Hill, but I try to do that right away.

19        Because of the time limitations on an appeal for

20   sentencing purposes or for general purposes, I try to get back

21   to the client sometime the next day or the weekend and tell

22   him, I don't have think you have any appeal issues in this

23   case.  I would explain why.

24        Even if he wanted me to file an appeal there, what I

25   would do is basically file an appeal -- and I have done that

1  in many situations -- not many; a couple situations --

2  subsequently when you do your appellate brief to the Superior

3  Court, then I would file what we call an Anders brief,

4  explaining to the court the appeal issue that my client wanted

5  to raise and then going on -- in favor -- in evidence most

6  favorable to him, explain the issues that he wanted me to

7  bring up on appeal.  And I usually would follow that sometimes

8  with, in addition to the Anders brief, a copy of a Motion for

9  Withdrawal of Counsel.

10         I've done that in a couple of cases.

11

12  BY MR. ENGLE:

13     Q     Only in those cases, is that where the defendant has

14  indicated to you, I want an appeal, and you've had a

15  consultation with him regarding the issues on appeal and they

16  were still insistent upon an appeal?

17     A     That's correct.

18     Q     That's when you file what's known as an Anders

19  brief?

20     A     I would do that even though him and me didn't see

21  eye to eye on whether there were any viable appeal issues.

22  I still wanted to protect his rights as far as possibility.

23         I would file an appeal -- I have done it in a number

24  of cases where I didn't think there was anything to argue with

25  regard to sufficiency or weight of the evidence or any other

29

1     issues.  But I would still file the appeal.

2             The filing of an appeal itself is very easy.

3     Basically it's a format -- it's a Notice of Appeal which you

4     file, and that gets the motion in process.

5         Q    Did you receive any communications from

6     Mr. Flemming -- or Mr. King -- after sentencing; either

7     written or oral?

8         A    Yes, I did.

9         Q    Do you have those in the file?

10        A    Could I say one thing prior to that?

11        Q    Sure.

12        A    I think Mr. Flemming indicated he had very limited

13     contact or no contact with me prior to his trial, and I think

14     he indicated I saw him the day before trial and talked to him

15     about his case, and I have documentation in here to refute

16     that because that's not true at all.

17             There are a number of contacts I had with

18     Mr. Flemming six months, if not more, prior to his trial in

19     which I did ancillary matters for him while he was

20     incarcerated.  One was a reinstatement of bail.

21             My understanding was he failed to appear for a court

22     hearing in front of Judge Lewis and a capias was issued by

23     Judge Lewis.

24             MR. SOCHA:  Your honor, I don't mean to interrupt

25     Mr. Duda.

30

1          That's really not an issue we're referring to here.

2          THE WITNESS:  Okay.

3          MR. SOCHA:  We're not raising anything concerning

4    his stewardship prior to trial.

5          THE COURT:  But it does go to the overall

6    credibility, and to the extent that your client has made any

7    representation here today which is believed to be untrue,

8    dealing with the general subject of representation, I think is

9    relevant.

10         So, you know, you're going to ask me to find your

11   client credible on the witness stand as to his representations

12   to Mr. Duda, and I have to take that in context with all the

13   representations and statements he's made from the stand.

14         Go ahead.

15

16   BY MR. ENGLE:

17         Q    Mr. Duda, how would you characterize your working

18   relationship with Mr. Flemming prior to trial?

19         A    I thought it was all right.  He -- I didn't perceive

20   him being hostile or unreasonable or anything to that extent.

21         Q    Okay.  And how would you characterize it post-trial

22   and after sentencing?

23         A    I didn't have much contact or any contact with

24   Mr. King after he was sentenced, and I guess that's the

25   problem.  He never contacted me.  I never got messages.

31

1          There were messages that he wanted to contact me

2    prior to trial, six or seven or eight months, and I did see

3    him and I did file stuff on his behalf.  But after sentencing,

4    I -- I mean I could tell you when I did receive contact or did

5    hear from Mr. Flemming, but that's the problem.  I didn't hear

6    from Mr. Flemming after he was sentenced.

7          Q    Did you receive any written communications from

8    Mr. Flemming after he was sentenced?

9          A    Yes, I did.

10         Q    Mr. Duda, can you show us -- pull out any type of

11   communications you received from Mr. Flemming?

12         A    I have three specific communications from

13   Mr. Flemming in my file.  The first one was from Camp Hill and

14   was dated August 22nd of 1996.  It was addressed to me at the

15   Public Defender's Office.

16              MR. ENGLE:  Before we go any further, let me have

17   this marked.  We'll mark it as Commonwealth Exhibit 1.

18              For the record, I've provided counsel, Mr. Socha,

19   what copy.

20

21              (Document is received and marked as Commonwealth

22   Exhibit No. 1 for identification as of this date.)

23

24   BY MR. ENGLE:

25         Q    Let me give you what's been identified as

32

1  Commonwealth Exhibit No. 1.

2         Can you indicate to us who that letter is from?

3     A    I'm assuming it's from Joe King a/k/a John

4  Flemming.  There's two names on here.  It's Joes King and then

5  at the bottom, Sincerely, Joe King.  It has what appears to be

6  his inmate number, and then John D. Flemming.

7     Q    Is that letter dated?

8     A    Yes, it is.

9     Q    What's the date?

10    A    The date is August 22nd of 1996.

11    Q    And in that letter did he indicate to you any type

12 of concern with regard to his direct appeal or the status of

13 his direct appeal?

14    A    The first sentence in this letter indicates he's

15 requesting transcripts from his trial and sentencing.  Then he

16 indicates he had a conversation with the Clerk of Courts, and

17 then at the end he says, last sentence, I am in need of your

18 help in this matter.

19    Q    Meaning what to you?

20         MR. SOCHA:  Your honor, I think the letter speaks

21 for itself, your honor.

22         THE COURT:  I think it does.

23    A    As a result of this letter -- as a result of this

24 letter, I responded to Mr. King by my own letter dated

25 August 28th, in which I provided him what he requested in his

33

1    August 22nd letter, and that was the trial, guilty plea, and

2    sentencing transcripts, and I have a copy of that.

3              MR. ENGLE:  Could I have this marked as Commonwealth

4    Exhibit 2?

5

6              (Document is received and marked as Commonwealth

7    Exhibit No. 2 for identification as of this date.)

8

9              MR. ENGLE:  For the record, I've provided a copy of

10   Commonwealth Exhibit 2 to Mr. Socha.

11

12   BY MR. ENGLE:

13        Q    Can you identify for us what Commonwealth Exhibit

14   No. 2 is?

15        A    A letter addressed to Mr. King at SCI Camp Hill,

16   dated August 28, 1996.  It's a short and brief sentence

17   indicating that I have enclosed his trial, guilty plea, and

18   sentencing transcripts per his request of August 22, 1996.

19        Q    Okay.  Thank you.

20             Are there any other further communications that you

21   had with Mr. Flemming after that?

22        A    Writing or on the phone?

23        Q    In writing or orally?

24        A    Not orally.  There were two other letters.  They

25   were not addressed to me, but they were ultimately provided to

1  me.

2     Q    Okay.  In review of those, have you had a chance to

3  review those letters?

4     A    Yes, I have.

5     Q    Are there indications in there about his direct

6  appeal?  Any type of communication there?

7     A    There's a letter addressed to Mr. Shultz who is the

8  Chief Public Defender at the time.  That letter was not dated,

9  but the postmark on the envelope was March 23, 1998.

10        And he writes to Mr. Shultz, basically indicating

11  that I had violated his Constitutional rights to appeal and

12  was ineffective in the due process and ineffective in

13  preparing the case and abused my responsibility as counsel for

14  an equity defense.

15        I did not make any objection for -- during trial for

16  two witnesses who were seated side by side in the courtroom.

17     Q    But Mr. Duda with regard to the direct appeal, he

18  does raise that issue some two years later then.  Correct?

19     A    Yes.

20     Q    In writing to Mr. Shultz?

21     A    Yes.  In the body of the letter he says, I would

22  like to know if there is going to be an appeal in this case.

23        MR. ENGLE:  I don't know.  What's the court's

24  feelings with regard to going into the issue about the witness

25  that testified, Miss Foltz; if we need to address that?

DAUPHIN COUNTY COURT REPORTERS

35

```
 1              THE COURT:  Well, I think at this point you want to
 2    elicit from trial counsel whether he reviewed the case
 3    independently of any requests of his client and made any
 4    independent determination as to these specific issues:  Rule
 5    1100, sufficiency of the evidence, Ida Foltz's testimony.
 6              Maybe you begin by asking Mr. Duda whether, first,
 7    as a routine matter, he reviews the trial history and the
 8    testimony and in all cases makes an independent determination
 9    as to whether or not there are appellate issues.
10              Do you do that?
11              THE WITNESS:  Yes, I do, your honor.
12              THE COURT:  I would think that you would.
13              THE WITNESS:  Yes.
14
15    BY THE COURT:
16         Q    Did you do so in this case?
17         A    Yes, I did.
18         Q    What were your conclusions?
19         A    I did not feel in Mr. Flemming's case that even when
20    he did not contact me, as I indicated, even when a client does
21    not contact me but I feel there are viable issues for appeal,
22    just to protect his rights, I will file an appeal and then
23    discuss those prior to actually doing the brief.  But at least
24    the process is set in motion.
25              I did do this in Mr. Flemming's case.
```

36

1      Q    All right.  And you concluded that there wasn't

2  even, as you put it, a scintilla of doubt in the record

3  concerning the sufficiency of the evidence?

4      A    The first thing I would have reviewed is any

5  pretrial matters.  I don't think there was in this case a

6  suppression hearing, but if there are any pretrial matters or

7  Rule 1100 matters, which would be a pretrial matter, and I

8  believed there was any viable appeal issue on that, then, of

9  course, that would be an issue that I would have, of course,

10  raised on appeal, and I have done that in the past.

11          The next thing I would look at --

12      Q    Hold on.  Let's just stay with Rule 1100 for a

13  moment.

14          Do you -- have you had a chance to review your file

15  prior to your testimony here today and revisited the Rule 1100

16  issue?

17      A    I've briefly reviewed the file.  With regard to the

18  Rule 1100 issue --

19      Q    The district attorney's answer to the PCRA Petition

20  sets forth in some detail the time periods which could be

21  excluded from the computation of the rule.

22          Part of it was the defendant's unavailability

23  because he didn't show for trial and a capias was issued

24  against him.  And let's see.  There was another period before

25  that.

37

1        In any event, did you see any error at all in this

2   court's refusal to grant dismissal under Rule 1100?

3        A    No.

4        Q    All right.  The next thing that he's raised has to

5   do with the sufficiency of the evidence.

6        Why didn't you think there was an issue there?

7        A    If I recall Mr. Flemming's defense was he never

8   denied hitting -- I forget who the victim was in this case.

9   It was a man -- hitting the victim in this case with a lead

10  pipe and fracturing his arm.

11       I don't think he ever denied that.  His defense, I

12  believe, was self-defense; that he did do it, but he was

13  threatened by this man, and he was coming after him.

14       From what I recall, the two were struggling.  I

15  don't think I would have the transcript at that time, but just

16  reviewing my notes of what was said at trial, I didn't think

17  there was a scintilla of doubt concerning the sufficiency of

18  the evidence.

19       Q    Straight credibility issue for the jury.

20       A    Yes.

21       Q    The other issue has to do with Ida Foltz.  There are

22  two issues that he raises your ineffectiveness with regard to

23  that testimony.

24       First, that you failed to object at all to her

25  testimony, and then secondly, once she had testified, you --

38

1   you apparently pursued to some extent a PFA issue.

2          Why don't we put this right now on the record here

3   in context.   Ida Foltz wasn't the victim?

4      A    That's right.

5      Q    How did Ida Foltz -- how did she play into the whole

6   factual summary of the case?

7      A    From my understanding, there was a relationship that

8   had existed prior to this incident and even after this

9   incident concerning Mr. Flemming and Miss Foltz; whether they

10  were girlfriend and boyfriend, I think they were.

11         It was a volatile situation between them, and my

12  understanding -- I'm trying to recall -- but my understanding

13  was she had broken off the relationship with Mr. Flemming, but

14  Mr. Flemming was still seeing her, was still visiting her, was

15  still pursuing her.

16         From my recollection at the time of this incident,

17  they -- Mr. Flemming was in the area where she was and this

18  other guy was.   I'm not quite sure whether there was a heated

19  discussion or there was a discussion between Mr. Flemming and

20  Miss Foltz, and Miss Foltz says something like, Just get away

21  from me; I don't want to have anything to do with you.

22         This other guy comes into play, and I think a

23  struggle ultimately ensued inside the apartment, if I'm not

24  mistaken, a vestibule or something inside of an apartment,

25  where I think both individuals had a weapon.

39

1       I think initially the victim in this case had a

2   pipe.  There was a struggle.  Mr. Flemming took the pipe and

3   then when the other guy didn't have a weapon, proceeded to

4   strike this gentleman.

5       Q   Wasn't Ida Foltz -- her role in this was that she

6   was having a relationship with the victim, Gary Null, in the

7   case.

8       Isn't that how she -- I mean wasn't this basically

9   a -- I hate to call it a love triangle -- but wasn't Ida Foltz

10  the object of the amorous intentions of both your client and

11  the victim?

12      A   Yes, that's correct.

13      Q   Okay.  So that's how she -- and she was a

14  witness --

15      A   That's correct.

16      Q   -- to what happened.

17      Okay.  Now, going to the PFA, do you remember how

18  that came into the picture?

19      A   I -- from reviewing the transcript, I think

20  Miss Woodside, who was the district attorney at the time

21  trying the case, had asked about the relationship.

22      She asked about a general relationship concerning

23  her and Mr. Flemming, and she just asked the question, What

24  was your relationship on such and such a date or at such and

25  such a time?

1    And I think just -- she came out indicating there

2  was a Protection from Abuse Order, and that was it.  It

3  wasn't -- she just stated it, and I think Miss Woodside went

4  onto another line of questioning.

5    On cross-examination I perceive that to be -- at

6  least -- not primary to the case, but secondary to the case

7  but something, at least, to be considered by the jury.

8    On cross-examination I think I brought out from

9  Miss Foltz that, in fact, the Protection from Abuse Order had

10  not been in effect at the time of this incident with

11  Mr. Null, but did not go into effect until after the incident

12  happened.

13

14  BY MR. ENGLE:

15    Q    It was after the incident but prior to the trial

16  that the PFA was in effect, correct?

17    A    That's correct.

18    Q    Your understanding was when she testified on direct,

19  she blurted it out.  But why, in fact, didn't you object or

20  feel it was necessary to object or request a cautionary

21  instruction, I suppose, with regard to that statement?

22    A    I thought on cross-examination she basically

23  admitted -- I don't know if I argued this -- I probably did

24  argue it -- but I didn't want to dwell on it is that the

25  Protection from Abuse had no relevance to this particular

41

1    incident because it did not involve Mr. Flemming and the

2    victim in this case, Mr. Null.

3           And secondly, it had no relevance.  It had no fact.

4    It wasn't in effect at the time.  She came off as very --

5           THE COURT:  Let me just jump in, because Mr. Socha

6    would say, Well, if it had no relevance then when you first

7    heard the D.A. get into the PFA, why didn't you object on the

8    basis of relevance?

9       A    Well, that is the problem.  The D.A. didn't get into

10   it.

11          By reviewing the transcript, I think Miss Woodside

12   didn't even mention it in her question, a Protection from

13   Abuse.  She was more concerned with what the relationship was

14   and the victim -- or this Miss Foltz blurted out that I have a

15   Protection from Abuse Order against him.  And by objecting to

16   it, not only do you put more emphasis on it, but the jury has

17   already heard that.

18

19   BY MR. ENGLE:

20      Q    Okay.  But then you went on to cross-examination and

21   you brought it up again.

22          What evidentiary value did you perceive that to have

23   with regard to Mrs. Foltz's posture in the case on direct

24   examination?

25      A    Well, she came off on direct examination, it was

DAUPHIN COUNTY COURT REPORTERS

42

1   apparent to me -- probably apparent to everyone in the

2   courtroom -- that she had a very hostile, biased attitude

3   against Mr. Flemming.

4       Q    Okay.  And, therefore, you wanted to delve into that

5   a little bit on cross-examination?

6       A    I think very little.  I think the questions I asked

7   basically was, Do you know when it was in effect?

8            She said, No.

9            I said, Was it in effect at the time of this

10  incident?

11           And she said, No.

12           That's where I left it.

13           THE COURT:  Let's say, Mr. Duda, that this evidence,

14  for argument's sake, was irrelevant.

15           Do you think in your professional judgment that that

16  had any bearing on the truth-determining process, such that

17  were it not in the case, the jury may have returned a verdict

18  other than it did?

19           THE WITNESS:  None, whatsoever.

20

21  BY MR. ENGLE:

22      Q    And, Mr. Duda, I think those are the only issues

23  that Mr. Socha raises.

24           And we've heard you testify that you would take a

25  direct appeal if you felt there were issues of merit with

43

1    regard to the trial itself.

2            If you felt as though there were issues with regard

3    to your effectiveness as trial counsel on direct appeal, would

4    you guide your client in that direction to get other counsel

5    so they could raise those issues on direct appeal?

6            If you felt you were truly ineffective and doing

7    something wrong, what would you do?

8        A    And that has happened on occasion when I was a

9    public defender, and I've raised those issues in filing notice

10   of appeal or matters complained of or -- I don't know if I've

11   raised it on a brief, appellate brief, but on matters

12   complained of, I've raised those issues sometimes where I felt

13   I was ineffective because I failed to do that or failed to do

14   this, and I've raised those issues.

15       Q    And you did not raise those issues in this case?

16       A    No.

17       Q    Did you feel as though you were ineffective at any

18   point in this trial with regard to any of these matters?

19       A    No, no.

20           MR. ENGLE:  Nothing further, your honor.

21           MR. SOCHA:  Your honor, I would like the opportunity

22   to look at the other two letters that Mr. Duda alluded to in

23   his review of the file that are not marked as exhibits.

24           THE COURT:  Sure.

25

44

<u>CROSS-EXAMINATION</u>

BY MR. SOCHA:

Q     These are -- these letters were in your file, as well, correct; in addition to the two that have been previously marked?

A     That's correct.

MR. SOCHA:  Your honor, if I could, I'd like to have these marked as Petitioner's Exhibits 1 and 2.

Petitioner's Exhibit 1 would be a letter that has an envelope stamp to it, postmarked March 23, 1998, and in the letter addressed to Mr. Shultz, signed by Mr. King, he alludes to violations of his Constitutional right to appeal.

The purpose of the letters would be to indicate that Mr. King had always maintained there had been an appeal or believed that he wanted an appeal.  It goes to the court's comment earlier.

If it's a credibility issue regarding that, I think the record should establish that there's been ongoing correspondence.

THE COURT:  Yes, it's been discussed and it's in the record, and I think we can supplement the record with the actual document.

MR. SOCHA:  I guess Petitioner's Exhibit 2 would be a list of letters that are clipped together, addressed -- signed by Mr. King and addressed, one, to Judge Morrison.  And

45

1   a number of other letters signed by Mr. King, again alluding

2   to his request for an appeal.

3

4          (Two documents are received and marked as

5   Petitioner's Exhibits Nos. 1 and 2 Exhibit for identification

6   as of this date.)

7

8   BY MR. SOCHA:

9       Q    My understanding is you did indicate after

10  sentencing in this case that you had no contact with

11  Mr. Flemming at all regarding an issue of appeal; is that

12  correct?

13      A    Until August 22nd.

14      Q    And you knew that he was incarcerated at that

15  particular time?

16      A    Yes.

17      Q    So by inference, it means you didn't go out and see

18  him either at Dauphin County Prison or Camp Hill to discuss

19  his intentions regarding appeal?

20      A    That's correct.

21      Q    You indicated that you believe that your

22  relationship with him at or about the time of sentencing was

23  okay, or you had no problems with your relationship with

24  Mr. Flemming?

25      A    I didn't perceive a problem.  Mr. Flemming, from

1  what I understand and what I can remember, was not -- some

2  clients are very aggressive, hostile, uncooperative, and I

3  didn't get that impression from Mr. Flemming.  He's a very

4  quiet man.  There were no shouting matches when I did talk to

5  him.  Anything that he asked me to do for him prior to trial

6  as well as after trial, I did for him.

7         He said I had no contact with him prior to trial,

8  but I filed a reinstatement for bail for him.  He was in

9  jail.  There was a capias issued by Judge Lewis for his

10  failure to appear.  I think the bail was on the simple assault

11  charge, and I went out there and talked to him and filed a

12  reinstatement for bail concerning the simple assault charge.

13  I did that for him.

14

15  BY MR. SOCHA:

16     Q    Not to interrupt you, but were you aware of the fact

17  that just prior to sentencing, Mr. Flemming had filed that

18  pro se PCRA Petition that Mr. Engle had alluded to and in the

19  words of the petition in which sought to sue you?

20         THE COURT:  Well, hold on a moment.

21         Prior to sentencing?

22         MR. SOCHA:  I believe it was, your honor.

23         THE COURT:  I don't think so.

24         MR. ENGLE:  Your honor, I believe it was filed May

25  the 13th and he was sentenced May the 16th.  You dismissed

47

1    that as untimely.

2            THE COURT:  All right.  I stand corrected then.

3            Were you aware of the May 13th PCRA petition that

4    was filed prior to May 16th when he was sentenced?

5            THE WITNESS:  I don't believe I was.

6

7    BY MR. SOCHA:

8        Q    Do you have any recollection at or immediately after

9    sentencing, Mr. King or Mr. Flemming verbally indicated to you

10   that, you know, I want to appeal.

11           And your response, I'll be out to see you?

12       A    I don't recall that.

13       Q    Could it have happened?

14       A    I guess -- I mean anything could happen and it's

15   possible anything could happen.

16           But as I indicated to Judge Kleinfelter, my practice

17   has been, and especially with regard to the sentence that he

18   received, I mean with regard to the sentence he received,

19   which was quite a lengthy sentence as far as minimum sentence

20   was concerned, if he would have indicated that to me at all, I

21   would have made a note of it -- I would have made a note of

22   it, first of all, and maybe not that same day, but certainly

23   within the time period afforded to appealing any sentence or

24   appealing any other matters, I would have gone out and seen

25   him.

1       There are two other matters I want to bring up.  We

2  have -- probably you know, Mr. Socha -- I don't know if you do

3  or not -- with the files provided by the Public Defender's

4  Office, we have certain time frames.  They're in three columns

5  and basically are preliminary hearing and then ARD request,

6  arraignment, discovery, and then we have trial and

7  sentencing.  And at the bottom here is an appeal.

8       There's a little box at the bottom of the file that

9  says, Appeal, and if the person wants to appeal, you mark yes

10 or no and the date due and file number.

11      I know a lot of public defenders don't do that, but

12 unlike a lot of public defenders, I'm very particular.  And if

13 someone wants an appeal, I will mark that down and at least

14 put the date down, or at least having something in addition to

15 that in my file.

16      As I said, I had almost no contact with

17 Mr. Flemming until his August 22nd letter requesting the

18 transcripts of his trial and sentencing.

19      Q    Will you agree you had no contact with him?

20      A    Yes.  I had no contact with him.

21      Q    And the letters you alluded to, Commonwealth

22 Exhibits 1 and 2, although he requested you provide copies of

23 the transcript, there is no indication in either of the

24 letters or his letter that he does not want to appeal; he's

25 just asking for copies of the transcript?

49

1      A    Which I provided him.

2      Q    Judge Kleinfelter asked you the thought process or

3  the evaluation that you made in this case pertaining to the

4  merits of any appeal, specifically on the Rule 1100 issue and

5  sufficiency of the evidence.

6           Could you indicate specifically when you went

7  through that mental evaluation regarding the merits of appeal?

8      A    I do that shortly after -- I do it twice. I do it

9  once after a verdict of guilty has been done. That would be

10 in March sometime. After the jury comes back and finds my

11 client guilty, not that day -- depending on when the jury came

12 back -- but either that Friday or weekend or probably the

13 weekend -- as you well know, you have a stack of files. Some

14 are guilty pleas, some are trials, and you don't get to

15 organize yourself for the following week and the following

16 criminal court term, but I reviewed that file. I made notes.

17          If there was a pretrial issue that had merit to it,

18 that would have been -- on the file we have places that say

19 witnesses here, but I use it for other purposes like ARD

20 information, and I make notes of each case.

21          If there's a Rule 1100 issue, I'll put Rule 1100

22 issue appealable or something like that. Of course, I do it a

23 second time after a person is sentenced.

24          I look at the sentence, see whether or not it's

25 within the standard range of the guidelines, and if it was an

50

1  aggravated sentence, whether there were adequate reasons given

2  by the court.

3      I actually review the file twice.  Once when the

4  jury has come back with a verdict and then following

5  sentencing.

6      Q    Are those notations regarding the review you just

7  testified to, are they indicated in the file of Mr. Flemming

8  at all?

9      A    I only make a notation in the file if there's

10 something that I consider to be a viable appeal.  I mean if I

11 don't consider a Rule 1100 to be appealable, I don't write it

12 in the file.  I don't have enough time to put down Review Rule

13 1100 issue; review bail issue -- I don't have time to do

14 that.

15      If something sticks out in my mind that has merit as

16 far as an appeal issue is concerned, that's when I put it in

17 the file.

18     Q    Did you ever communicate in any way your review that

19 you just testified to to Mr. Flemming and indicate to him in

20 writing that you didn't believe he had any issues that were

21 meritorious on appeal?

22     A    No, I did not.

23     Q    Basically what you're doing then is saying that

24 after sentencing you are, in essence, putting the onus on your

25 client to the communicate with you and get in contact with you

51

1    regarding his intentions for appeal?

2        A    In some situations that's correct.

3        Q    That's what you did in this case?

4        A    Yes.

5        Q    And it's a situation where you have an incarcerated

6    individual who had just received an 8-to 20-year sentence?

7        A    That's correct.

8            THE COURT:  I want to follow up on that because

9    that's not what I heard him say earlier.

10           You say you put the -- you've suggested to counsel

11    here on the witness stand that he places the onus of an appeal

12    on the client and depends on the client to contact him?

13           MR. SOCHA:  And I think he said yes to that.

14           THE COURT:  And he did say yes to that in response

15    to your question, but earlier he said that notwithstanding any

16    contact from the client, he makes an independent review of

17    appellate issues and independently would pursue the appeal,

18    regardless of that contact.  I want to make sure the record is

19    clear on that.

20           If counsel is simply saying after conviction, I

21    don't do anything with a case unless the client contacts me,

22    and I put the onus on him to make that contact, then I think

23    that's, per se, ineffective, and we are ready to vacate the

24    sentence right this very minute.  But that's not what I heard

25    him say earlier, so let's clarify that.

1          MR. SOCHA:  I'll rephrase it.

2

3    BY MR. SOCHA:

4          Q     In this particular case, the case of Mr. Flemming,

5    you've testified that you did, as you just testified, an

6    independent evaluation of the merits of this case?

7          A     I did.

8          Q     And in your estimation you found there were no

9    meritorious issues for appeal?

10         A     That's correct.

11         Q     And, therefore, you did not communicate your

12   thoughts or impressions to Mr. Flemming?

13         A     That's correct.

14         Q     And in this case, having conducted an independent

15   evaluation and finding no issues of merit, at least as it

16   pertains to him, you put the onus on him that if he did want

17   to appeal, he was to get in contact with you?

18         A     That's correct.  And most of the clients that I

19   represent in the Public Defender's Office do get in contact

20   with either me by phone or in writing soon after a sentence

21   or, as you well know, we have, for lack of a better word,

22   staff people that are constantly out at the prison that could

23   communicate with clients and then they come back and write us

24   notes or type up memos indicating that so-and-so wants to see

25   you about an appeal and so forth.

53

1    Q    Just very briefly.  Did you also indicate in certain

2  circumstances you go ahead and file the Notice of Appeal, and

3  then based upon an evaluation if you feel you have preserved

4  the issue for appeal, there are no meritorious issues, you

5  file what's referred to as an Anders brief?

6    A    Yes.

7    Q    That's an alternative that was available to you in

8  this particular case, and you didn't do that as well?

9    A    I only do that when a client wants me to appeal; he

10 says, Mr. Duda, I want to appeal this case and I find out why,

11 and he gives me one or as many as 10 reasons.  And at the time

12 I may consider those reasons frivolous or meritorious, but to

13 preserve his rights, I file the appeal.  That's after he has

14 indicated to me he wants to appeal the case.

15    Q    And it's your position you had no indication from

16 Mr. King regarding an appeal?

17    A    No, not even -- I mean even if you look at the

18 August 22, '96 hearing, he says in a vague way, I need your

19 help in this matter.  But, again, he never indicates in this

20 letter I want my transcripts; I want you to appeal; anything

21 to that extent.

22         MR. SOCHA:  If I may have one second?

23

24              (There is a pause.)

25

54

BY MR. SOCHA:

    Q    Just to make it clear, you did not correspond to Mr. King in any manner telling him you were not going to appeal?

    A    I guess that's a fair assessment.

    MR. SOCHA:  Thank you.

    MR. ENGLE:  Just one question.


<u>REDIRECT EXAMINATION</u>

BY MR. ENGLE:

    Q    Did you have adequate opportunity to discuss or to talk to Mr. Flemming after he was sentenced?

    A    I can't recall if I did or not, but I do recall that Judge Kleinfelter gave him his post-sentencing rights.  He sets forth the time limits.  He sets forth the time limits as to when you have to file any appeal.  If it's in regard to sentencing, you have 10 days.  With regard to any other matter, within 30 days, and he indicated to Mr. Flemming that you will still be -- if you can't afford counsel, you will still be afforded the assistance of a public defender.

    Do you understand these rights?  And Mr. Flemming said, Yes.

    Some clients turn to me and say on the record, I want you to appeal, right on the record in front of the judge.  I'll put a note down there or -- clear to me after I leave court, I'll write it down.

55

1      Mr. Flemming didn't say anything.  He said, I

2  understand my rights, and was escorted out of the courtroom.

3      MR. ENGLE:  Nothing further.

4      THE COURT:  All right.  You may stand down.

5      MR. SOCHA:  We have nothing further.

6      THE COURT:  At this juncture I will hear you

7  briefly, or would you like to submit briefs based on this

8  record?

9      MR. SOCHA:  Whatever the court would prefer.  I have

10  no preferences one way or the other.

11      I think the issue as to the appeal raise questions

12  based upon his testimony to what his counsel duties and

13  obligations are.

14      THE COURT:  Well, I guess that is, because I've

15  heard a lot of questioning here regarding conversation with

16  the client on the appeal issue.  But is there a duty -- have

17  the appellate courts imposed a duty as part of the overall

18  effective assistance of counsel issue to affirmatively discuss

19  an appeal with a client, independent of counsel's own

20  professional judgment?

21      MR. SOCHA:  I can't point to a case at this point.

22      THE COURT:  I've never seen a case that says that.

23  You know, I can see that there is a duty to make an evaluation

24  of the case and take an appeal if there are any appellate

25  issues that are perceived by counsel.  There's a clear duty to

56

1    do that.

2           But is there, to use the phrase, is there a bedside

3    manner-type of requirement that the attorney actually go over

4    all of this with the client, especially where he perceives

5    there to be no appeal issues?

6           MR. SOCHA:  I can't point to a case, but there are

7    numerous cases, I think, that state the right to appeal and

8    the right to waive an appeal is strictly a client's right and

9    not an attorney's right to do that on behalf of a client.

10          And taking those cases, my argument would be that if

11   an attorney such as Mr. Duda in this case comes to an

12   independent determination that this is a meritless appeal with

13   no good issues, I would take it one step further.  Given the

14   Constitutional right or the inherent right to appeal that that

15   has to be communicated to the client in some regard, saying

16   this is my professional opinion--

17          THE COURT:  You're telling me that a defendant has

18   the right to take a meritless appeal?

19          MR. SOCHA:  I think that's his right.  I want to

20   appeal.  You're well aware that --

21          THE COURT:  And so because we are providing legal

22   service, free of charge -- and this would never happen in the

23   private sector -- every defendant can say take an appeal, and

24   an attorney has to do that regardless of whether or not that

25   attorney independently perceives there to be an appellate

1    issue?

2              MR. SOCHA:  I think every criminal defendant

3    convicted has a Constitutional right to appellate review of

4    the sentence.

5              THE COURT:  In the abstract, yes.

6              MR. SOCHA:  And whether that issue is meritorious or

7    not is basically determined by the Superior Court or the

8    appellate court when they make that review.

9              THE COURT:  Well, in that case why wouldn't

10   everybody in every case file an appeal?

11             MR. SOCHA:  In most cases they basically do.  I

12   think the remedy that the courts have fashioned in those

13   cases, which is what Mr. Duda alluded to, are the provisions

14   for an Anders brief.  I think that's the route the courts have

15   said.

16             You have the right to take the appeal or the

17   decision to take the appeal lies with the client and then

18   counsel's corresponding duty, professional duty really, is

19   having made an independent review of that record and feels

20   those issues are not meritorious --

21             THE COURT:  And would you also say an attorney, a

22   public defender -- let's stay with public defenders -- has a

23   duty to obtain a waiver from his client, No, I don't want to

24   take an appeal.

25             MR. SOCHA:  I think he does.  Under the whole

58

1    practical situation where the sentence is given, the defendant

2    is led out of the courtroom because of another case or

3    whatever.

4              THE COURT:  Do you know of any public defenders'

5    office in the Commonwealth of Pennsylvania that does that?

6              MR. SOCHA:  As a matter of course, I would think it

7    would be a matter of policy.

8              THE COURT:  That's what I mean.  As a matter of

9    course or matter of policy, every time I represent somebody,

10   whether it's on a guilty plea which could raise sentencing

11   issues, the voluntariness of the plea, I want every client to

12   sign off.  We want to document that that client does not want

13   to take an appeal.

14             MR. SOCHA:  I think there's a major distinction

15   between the entry of a guilty plea and a contested jury

16   verdict.

17             THE COURT:  Look, it's a Judgment of Sentence, and

18   from the moment the court imposes Judgment of Sentence, there

19   are potential appeal issues.

20             Was that plea voluntary?  Was this sentence legal

21   within the guidelines?  You have that even with a guilty

22   plea?  And, certainly, with a trial, you have all trial and

23   pretrial issues.

24             What I'm asking you is, as a former public defender

25   yourself and practicing in many counties, do you know of any

1   jurisdiction where the public defenders get that kind of

2   waiver of appellate rights?

3          MR. SOCHA:  I don't think they get a waiver.

4          What I would do as a matter of course, very frankly

5   from personal experience would be on a contested jury verdict

6   on a serious charge, I would, as a matter of course, file the

7   Notice of Appeal to --

8          THE COURT:  You file an appeal in every case for

9   everybody you represent regardless --

10         MR. SOCHA:  In guilty verdicts and contested pleas

11  in serious charges just to avoid the waiver of appeal rights.

12  I think that's a more prudent or cautious way to approach it.

13         In a case like this there's not even the letter from

14  Mr. Duda going to him and saying, Hey, look.  You have this

15  right to appeal.  I reviewed your file, and I don't think

16  there's anything here to appeal.

17         THE COURT:  Well, maybe it would be nice with

18  attorney/client relations to do that, but the client has heard

19  those appellate rights directly from the court the moment he

20  is sentenced.  He hears those rights.  So it's not that he

21  hasn't been informed of the rights.

22         MR. SOCHA:  Maybe what you're saying, basically, it

23  is the client's onus to communicate in some respects.

24         THE COURT:  You just told me a moment ago the right

25  to appeal is exclusively that of the client.

1        MR. SOCHA:  To make the decision whether or not to.

2        THE COURT:  So where is the onus?  Where the lawyer

3  independently determines that there are no appellate rights,

4  then if the lay defendant is going to decide whether there

5  should be an appeal, then shouldn't he be the one that has to

6  independently make that decision?

7        MR. SOCHA:  After communication with counsel,

8  perhaps.  I think that's why there's a 30-day period given

9  there.  Nobody expects it to be done at the heat of the moment

10  when you're standing at the bar having just been sentenced to

11  8 to 20 years.

12        Sometimes, I think, while the onus and decision is

13  on the client to appeal, I think there's a responsibility of

14  trial counsel in a case where a defendant is incarcerated, to

15  go see him at some point in 30 days.

16        THE COURT:  I agree there's an onus on counsel to

17  determine independently of what his client is telling him,

18  whether or not there are appeal issues and to perfect an

19  appeal and pursue it if he perceives there to be valid

20  issues.  Or, as Mr. Duda said, even a scintilla of

21  possibility.

22        But if he doesn't, then my understanding would be

23  then his obligation as effective counsel ends at that point;

24  that he shouldn't be asked to do what he doesn't believe is

25  necessary or proper under the facts or the law of the case.

61

1    That is, that there's no burden on counsel to pursue a

2    frivolous appeal.

3            MR. SOCHA:  If the client still requests that he do

4    it?

5            THE COURT:  And if the client requests.  But here

6    there's an issue of fact as to whether or not that happened,

7    and if I find that your client is credible; that he said to

8    Mr. Duda as soon as the verdict came in and as soon as the

9    sentence came in, and that was his testimony, I want you to

10   take an appeal.  Mr. Duda says he didn't say that.

11           If I then find that -- if I believe Mr. Duda and not

12   your client, are you saying that we have to go one step

13   further and Mr. Duda should have gone one step further and

14   somehow gotten some affirmative waiver where there was a duty

15   to communicate his own independent judgment not to file an

16   appeal so that the client would have a chance then to do it

17   some other way?

18           Well, if you find any appellate authority in this

19   issue in writing your briefs, I'm sure you'll share it with

20   me.  It presents an interesting issue.

21           MR. ENGLE:  Your honor, before -- I am sorry.

22           Before we're completely done, I didn't get a chance

23   to move into the record Commonwealth's Exhibits 1 and 2 before

24   we adjourn.

25

62

1          THE COURT:  We'll accept into evidence all of the

2   exhibits that were proffered.

3          We'll afford you -- how much time do you want?

4          MR. SOCHA:  Are you going to order this to be

5   transcribed?  Do you feel it's necessary to have the testimony

6   transcribed?

7          THE COURT:  Is anybody requesting it?

8          MR. SOCHA:  I don't think the issues are in

9   dispute.  I don't think we need the transcript.

10         I think there's a credibility determination, but --

11         THE COURT:  You can work without it.  I made notes

12  of what was said.  I don't think each of you -- there's no

13  question as to what the testimony was, just how we apply it.

14         Then we'll give you --

15         MR. SOCHA:  20 days will be fine.

16         THE COURT:  20 days to file a brief in support of

17  your motion, and we'll afford the district attorney 20 days,

18  thereafter, to file a responsive brief.

19         MR. SOCHA:  Thank you.

20         THE COURT:  Okay.

21

22         (The proceedings are concluded at 11:48 a.m.)

23

24                        --o0o--

25

63

1                     C E R T I F I C A T I O N

2

3          I hereby certify that the proceedings and evidence

4  are contained fully and accurately in the notes taken by me on

5  the hearing of the above cause, and that this is a correct

6  transcript of the same.

7

8

9                    Bart VanSomeren, RPR-CP
                      Official Court Reporter

10

11

12                          COPY

13

14

15

16

17         The foregoing record of the proceedings upon the

18  hearing of the above cause is hereby approved and directed to

19  be filed.

20

21

22                      _____
                      Joseph H. Kleinfelter, J.

23

24                      _____

25                          Date

APPENDIX "B"

COMMONWEALTH OF PENNSYLVANIA  :  IN THE COURT OF COMMON PLEAS
                              :  DAUPHIIN COUNTY, PENNSYLVANIA
                              :
          VS.                 :  NO.  1173 C.D. 1995
                              :
                              :
JOHN FLEMING[1], a/k/a Joe King  :  POST CONVICTION RELIEF ACT

---

<u>OPINION</u>

The matter for our disposition is defendant John Fleming's
(hereinafter "Fleming") petition for collateral relief under the Post Conviction
Relief Act ("PCRA").  Fleming was convicted by a jury of aggravated assault
on March 12, 1996, and, on May 16, 1996, was sentenced to a prison term
of eight to twenty years.  Michael Duda, Esquire, of the Dauphin County
Public Defender's Office, represented Fleming at trial.

Prior to being sentenced, Fleming filed an untimely PCRA
petition on May 13, 1996, pro se, which was denied by this court on May
14, 1996.  No direct appeal was filed.  On November 5, 1998, Fleming filed
a petition for allowance of a <u>nunc pro tunc</u> appeal which was denied by this
court on November 12, 1998.  We did, however, appoint Francis M. Socha,
Esquire to represent Fleming on his PCRA petition.

Fleming, through attorney Socha, filed a supplemental PCRA
petition on December 15, 1998, which was answered by the commonwealth

---

[1] We note that various pleadings spell petitioner's name with a double "m."  The correct
spelling, which we adopt in our opinion, is "Fleming."

on January 14, 1999.  Presently before us is Fleming's amended supplemental PCRA petition which was filed on February 18, 1999.  The court has received supporting briefs from both parties and conducted an evidentiary hearing on April 23, 1999.

In his amended supplemental PCRA petition, Fleming alleges two errors:

1.   Trial counsel was ineffective for failing to appeal the sufficiency of the evidence of Fleming's conviction;

2.   Trial counsel was ineffective for failing to object to the direct testimony of a commonwealth witness.

We begin by addressing the second of the two issues stated above.  Petitioner's brief contains no argument heading or discussion regarding a failure of trial counsel to object to the testimony of commonwealth witness Ida Foltz.  Accordingly, we deem this issue abandoned.  See, e.g., Commonwealth v. Perry, 420 A.2d 729 (Pa. Super. 1980); Commonwealth v. Dessus, 396 A.2d 1254 (Pa. Super. 1978).

We turn then to the claim of trial counsel's ineffectiveness for failing to file an appeal.  At the April 23, 1999 evidentiary hearing, petitioner testified that he advised trial counsel of his desire to appeal on two occasions.  First, he claims to have made the request immediately after the verdict was rendered on March 12, 1996; and again, he claims to have made the same request following sentencing on May 16, 1996.  He also claims

2

that Mr. Duda promised to come see him in prison, but never did so. It was only much later, after several inquiries, that Fleming discovered that no appeal was ever taken.

Michael Duda testified that he had been an assistant public defender for eight years. He had no recollection of any requests by Fleming regarding an appeal. Duda agrees that, following sentencing, he had no personal contact with petitioner. His file did reflect a written request from Fleming on August 22, 1996, for a copy of his transcript, which was provided by mail on August 28, 1996. There was also a March 23, 1998 letter to the chief public defender in which Fleming inquires if an appeal is going to be taken.

Mr. Duda testified that, regardless of any requests or discussion with his client, he would have filed a direct appeal if he believed there was a meritorious claim. In this case he found there to be no appealable issue.

It is well settled that a defendant controls several aspects of his representation, including his direct appeal.

> It is beyond cavil that a defendant has an absolute right to appeal, Pa. Const. art. V, sec. 9, and the ultimate decision of whether to do so must be made by the defendant and not counsel. (Citations omitted). At the same time, it is well settled that a defendant may waive the right to appeal, provided such waiver is a "knowing and intelligent" act on the part of a defendant. (Citation omitted).

Commonwealth v. Dosch, 501 A.2d 667, 670 (Pa. Super. 1985) citing

Commonwealth v. Stokes, 440 A.2d 591 (Pa. Super 1982). "[I]t is both the right and the responsibility of the defendant to determine whether a direct

3

appeal should be taken." <u>Commonwealth v. Johnson</u>, 512 A.2d 1242,
1249 (Pa. Super. 1986) (emphasis in original).

On the other hand, trial counsel has no duty—as petitioner
seems to suggest—to automatically file a notice of appeal in every case
simply to protect and perfect a defendant's appellate rights. To the
contrary, an attorney has a legal and ethical duty to avoid a frivolous appeal.
PA. R. APP. P. 2744; <u>Jones v. Barnes</u>, 463 U.S. 745, 103 S. Ct. 3308, 77 L.
Ed. 2d 987 (1983); <u>Commonwealth v. Rauser</u>, 532 A.2d 1191 (Pa. Super.
1987). Where trial counsel is faced with a request to appeal by a client and
believes there are no meritorious issues for appeal, counsel should petition
the court to withdraw from the case. <u>Commonwealth v. McClendon</u>, 495
Pa. 467, 434 A.2d 1185 (1981); <u>Commonwealth v. Smith</u>, 700 A.2d 1301
(Pa. Super. 1997).

Here, PCRA counsel has directed our attention to several cases,
e.g., <u>Commonwealth v. Keys</u>, 580 A.2d 386 (Pa. Super. 1990), which
address trial counsel's responsibility to preserve a client's appellate rights
while seeking to withdraw representation. These cases are not particularly
helpful since Mr. Duda makes no claim that he was seeking to withdraw or
that he was not counsel of record during the period for taking an appeal.

We are left simply with the issue as to whether Fleming's
assertion that he asked Mr. Duda to appeal is credible. We find that it is not.
Michael Duda was, at the time of Fleming's trial and sentencing, an
experienced public defender. He was fully acquainted with the appellate

4

process and his client's rights regarding same.  We believe, as Attorney

Duda has testified, that, had Fleming requested an appeal, one would have

been taken.  Accordingly, we conclude that Attorney Duda did not render

ineffective assistance of counsel to petitioner.

We enter the following:

### ORDER

AND NOW, this ⟨6th⟩ day of July, 1999, after consideration of

defendant John Fleming, a/k/a Joe King's petition under the Post Conviction

Relief Act, and after consideration of testimony heard at an evidentiary

hearing, defendant's petition is hereby DENIED.

BY THE COURT:

_____
Joseph H. Kleinfelter, Judge

RECEIVED

JUL 1 9 1999

CLERK OF COURT
DAUPHIN COUNTY

Distribution:

Francis M. Socha, Esquire, 2201 North Second Street, Harrisburg, PA
    17110
John Fleming, CZ-9499, E-1, P.O. Box 256, Waymart, PA  18472-0256
Jeffrey B. Engle, Esquire, District Attorney's Office

**APPENDIX "C"**

IN THE SUPERIOR COURT
OF PENNSYLVANIA

No.  1301 MDA 1999

COMMONWEALTH OF PENNSYLVANIA,

Appellee

vs.

JOHN FLEMING (a/k/a Joe King),

Appellant

BRIEF FOR APPELLANT

Appeal from the Order
of the Honorable Joseph H. Kleinfelter,
Court of Common Pleas, Dauphin County,
Dated July 16, 1999 and
Docketed at 1173 C.D. 1995

FRANCIS M. SOCHA, ESQ.
2201 North Second Street
Harrisburg, PA  17110
(717) 233-4141

Attorney for Appellant

Received in Superior Court

DEC  3 1999

MIDDLE

RECEIVE

DEC 0 6 1999

DISTRICT ATTORNEY'S
OFFICE
DAUPHIN COUNTY

# TABLE OF CONTENTS

TABLE OF CITATIONS.................................... i

I.    STATEMENT OF JURISDICTION........................... 4

II.   SCOPE OF REVIEW/STANDARD OF REVIEW.................. 5

III.  ORDER IN QUESTION.................................. 6

IV.   STATEMENT OF THE CASE.............................. 7

V.    ISSUES INVOLVED................................... 12

VI.   SUMMARY OF ARGUMENT............................... 13

VII.  ARGUMENT.......................................... 14

VIII. CONCLUSION........................................ 20

## TABLE OF CITATIONS

Case                                                                Page

Anders v. California
386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)....  14

Commonwealth v. Doswell
___ Pa. ____, 621 A.2d 104 (1993)...................  18

Commonwealth v. Douglass
403 Pa.Super. 105, 588 A.2d 53 (1991)...............  18

Commonwealth v. Gabrielson
370 Pa.Super. 271, 536 A.2d 401 (1988)..............  16

Commonwealth v. Glass
413 Pa.Super. 426, 605 A.2d 432 (1992)..............  16

Commonwealth v. Jackson
506 Pa. 469, 485 A.2d 1102 (1984)..................  16

Commonwealth v. Keblitis
500 Pa. 321, 456 A.2d 149 (1983)...................  16

Commonwealth v. Lantzy
___ Pa., ___, 736 A.2d 564 (1999)..................  17

Commonwealth v. Macolino
503 Pa. 201, 469 A.2d 132 (1983)...................  16

Commonwealth v. Pierce
515 Pa. 153, 527 A.2d 973 (1987)...................  16

Commonwealth v. Perlman
392 Pa.Super 1, 572 A.2d 2, 4 (1990)................  16

Commonwealth v. Perry
464 Pa. 272, 346 A.2d 554 (1975)...................  14

Commonwealth v. Robinson
452 Pa.Super. 606, 682 A.2d 831 (1996)..............  5,14

Commonwealth v. Simpson
436 Pa. 459, 260 A.2d 751 (1970)...................  16

Commonwealth v. Smith
240 Pa.Super. 212, 361 A.2d 862 (1976),rev'd,
477 Pa. 424, 383 A.2d 1280 (1978)..................  18

Commonwealth v. Wilkerson
490 Pa. 296, 416 A.2d 477 (1980)...................  14

I.   STATEMENT OF JURISDICTION

Jurisdiction is conferred upon this Court by the Act of 1976, July 9, P.L. 586, No. 142 section 2, 42 Pa.C.S. §742, providing that the Superior Court shall have exclusive appellate jurisdiction of all appeals from final orders of the Courts of Common Pleas, regardless of the nature of the controversy or the amount involved, except such classes of appeals as are by any provision of this chapter within the exclusive jurisdiction of the Supreme Court or the Commonwealth Court.

## II.  SCOPE OF REVIEW/STANDARD OF REVIEW

SCOPE OF REVIEW:

Appellant contends that this Honorable Court must confine its examination of the record to whether the trial court erred as a matter of law in holding that Appellant's trial counsel was not ineffective for failing to appeal the sufficiency of the evidence of the Appellant's conviction and failing to object to the direct testimony of Commonwealth witness Ida Foltz.

STANDARD OF REVIEW:

In reviewing a dismissal of a PCRA petition, an appellate court's scope of review is limited to determining whether the PCRA court's findings were supported by the record and its order is otherwise free from legal error. <u>Commonwealth v. Robinson</u>, 452 Pa.Super. 606, 682 A.2d 831, 833 (1996). An appellate court will not disturb the findings of the PCRA court unless they have no support in the record. <u>Id.</u>

III.   <u>ORDER IN QUESTION</u>

This appeal is taken from the Order of the Court of Common Pleas, Dauphin County, Pennsylvania, dated July 16, 1999, by the Honorable Joseph H. Kleinfelter to wit:

"AND NOW, this 16th day of July, 1999, after consideration of defendant John Fleming, a/k/a Joe King's petition under the Post Conviction Relief Act, and after consideration of testimony heard at an evidentiary hearing, defendant's petition is hereby DENIED."

## IV. STATEMENT OF THE CASE

On March 12, 1996, the Appellant, John Fleming, (a/k/a Joe King), was convicted by a Dauphin County jury with the Honorable Joseph H. Kleinfelter presiding on the charge of aggravated assault docketed to 1173 C.D. 1995.

At trial, the victim, Gary Null (hereinafter "Null"), testified that on January 31, 1995 he was traveling to visit a friend, Ida Foltz (hereinafter "Foltz"), at her residence in Harrisburg, Pennsylvania. (N.T. 23). Null testified that when he approached Foltz's residence he noticed the Appellant talking with her and he immediately pulled his car over and asked the Appellant "Why can't you leave that woman alone?" (N.T. 24). Thereafter the two men exchanged glances at each other and Null and Foltz left the area to go to a "beer distributor." (N.T. 25). Upon driving back to Foltz's residence, Null testified he noticed the Appellant standing about a 1/2 block away with a "two (2) by four (4)" in his hands and that he reached for a lead pipe in his car to threaten the Appellant. (N.T. 26). Null testified that after the encounter he helped Foltz enter her residence when he was suddenly jumped from behind by the Appellant. (N.T. 27-28). Null testified that the Appellant took his lead pipe from him and began beating him with the lead pipe. (N.T. 27-28). Null testified that he was on his back during the entire time the Appellant was beating him and that at the time of the confrontation he was 5'10" and weighed 250 pounds. (N.T. 29, 48).

Ida Foltz testified that she had an outstanding Protection

From Abuse (P.F.A.) Order against the Appellant during the time of this incident.    (N.T. 53).    Foltz testified that the Appellant jumped Null from behind and beat Null while he was on his back. (N.T. 56-59).

Cindy Hatter, a nurse at Polyclinic Medical Center, testified on behalf of the Commonwealth concerning Mr. Null's various injuries.    (N.T. 63-64).

Officer Michael Savel testified on behalf of the Commonwealth that he investigated the incident and did not find any wood or lead pipe in the area of the fight.    (N.T. 92).

The Appellant testified on his own behalf that while he was standing talking to Foltz at her residence, Null approached him and threatened him with a lead pipe.    (N.T. 101-103).    The Appellant testified that Foltz removed Null from the area since she thought he had been "drinking."    (N.T. 103-104).    Appellant testified that upon Null and Foltz returning to the area[1], Null again threatened him by calling him a "woman beater and a faggot and pussy" in a manner which indicated that he wanted to fight the Appellant. (N.T. 105-106).    The Appellant testified that he approached Null to inform him that the reason he was talking with Foltz was due to a personal problem he was having.    (N.T. 106).    Thereafter, the Appellant testified that Null raised the lead pipe up in the air to strike him and in a defensive maneuver the Appellant removed a wooden stake from the ground nearby and started striking Null.

---

    [1] Appellant lived approximately two (2) blocks from Foltz's residence.    (N.T. 99).

(N.t. 109).  The Appellant testified that the wooden stake broke after hitting Null's pipe and then he fled to Ms. Foltz residence. (N.T. 109).  The Appellant testified that Null followed him back to the residence, a struggle ensued and he snatched the pipe from Null and began striking him in self-defense.  (N.T. 110-113).  The Appellant testified that he was 6'1" and weighed 150 pounds at the time of this altercation.  (N.T. 108).

On May 16, 1996, the Appellant was sentenced by Judge Kleinfelter to a term of imprisonment of eight (8) to twenty (20) years on the charge of aggravated assault docketed to 1173 C.D. 1995.  Appellant was represented at trial and sentencing by Michael Duda, Esquire, from the Dauphin County Public Defender's Office.

No direct appeal of the Appellant's conviction was undertaken nor did trial counsel file a formal petition to withdraw as counsel.

On or about November 11, 1998, the Appellant filed a pro-se petition for allowance of appeal nunc-pro-tunc and on November 12, 1998 this Honorable Court denied the Appellant's petition and appointed counsel to represent the Appellant under the Post Conviction Relief Act (PCRA). On December 15, 1998, the Appellant filed a supplemental PCRA Appellant and alleged that trial counsel was ineffective for failing to appeal the sufficiency of the evidence of his conviction[2] and that trial counsel was ineffective

---

[2]  Appellant notes that he also raised the issue that trial counsel was ineffective for failing to raise on appeal the trial court's denial of his motion to dismiss under Pa.R.Crim.P. 1100. After further review of the docket, trial transcripts and relevant case law, the Appellant withdraws this issue.

for failing to object to the direct testimony of Commonwealth witness Ida Foltz regarding a protection from abuse order she had filed against the Appellant.

On January 14, 1999 the Commonwealth filed an Answer to the Appellant's supplemental PCRA petition. On February 18, 1999, the Appellant filed an amended supplemental PCRA petition whereby the Appellant alleged the same three (3) issues of trial counsel ineffectiveness and included a sworn affidavit that he requested trial counsel to appeal his conviction.

On April 23, 1999 an evidentiary hearing was held in front of the Honorable Joseph H. Kleinfelter in regard to the issues raised in the Appellant's amended supplemental PCRA petition. At the evidentiary hearing, trial counsel Michael Duda (hereinafter "Duda") testified that he had no contact with the Appellant after the date of sentencing. (N.T.E.H. 48). Attorney Duda testified that he had no recollection pertaining to any request(s) made by the Appellant for an appeal of his conviction and did not attempt to communicate with the Appellant, either in person or by mail, in order to determine the Appellant's desire to appeal his conviction. (N.T.E.H. 47-48). Attorney Duda further testified that he reviewed the file after trial and sentencing and concluded that there were no meritorious issues to appeal. (N.T.E.H. 35-36). However, Attorney Duda testified that he never communicated his conclusion to the Appellant. (N.T.E.H. 48).

The Appellant testified that immediately after sentencing he informed Attorney Duda that he wanted an appeal to be filed.

(N.T.E.H. 10).  The Appellant further testified that he repeatedly contacted the Dauphin County Public Defender's Office regarding the status of his appeal and was informed that "it take(s) time." (N.T.E.H. 13).  It was only after the Appellant contacted the Dauphin County Clerk of Courts office and requested a copy of the docket that he learned that an appeal was never filed.  (N.T.E.H. 13).

On July 16, 1999 the Honorable Joseph H. Kleinfelter denied the Appellant's request for relief under the PCRA and on July 27, 1999 the Appellant filed a timely Notice of Appeal.

V.   <u>ISSUES</u>:

1.   DID THE TRIAL COURT ERR IN FAILING TO FIND THAT TRIAL
     COUNSEL WAS REQUIRED TO FILE A NOTICE OF APPEAL
     ON BEHALF OF THE APPELLANT IN ORDER TO PROTECT THE
     APPELLANT'S APPEAL RIGHTS?

     Suggested answer in the affirmative.

2.   WAS TRIAL COUNSEL INEFFECTIVE FOR FAILING TO APPEAL
     THE SUFFICIENCY OF THE EVIDENCE OF THE APPELLANT'S
     CONVICTION?

     Not addressed by the lower court.

3.   WAS TRIAL COUNSEL INEFFECTIVE FOR FAILING TO
     OBJECT TO THE DIRECT TESTIMONY OF COMMONWEALTH WITNESS
     IDA FOLTZ THAT SHE HAD A PROTECTION FROM ABUSE
     ACT ORDER ENTERED AGAINST THE APPELLANT PRIOR TO
     THE COMMISSION OF THE UNDERLYING OFFENSE?

     Not addressed by the lower court.

## VI.    SUMMARY OF ARGUMENT

The trial court erred in failing to find that trial counsel was not required to protect the Appellant's appeal rights. Appellant contends that the evidence presented at the evidentiary hearing indicated that the Appellant's trial counsel failed to protect the Appellant's appeal rights or inform the Appellant that he believed an appeal was meritless.  Appellant contends that the record indicates that the Appellant requested trial counsel to appeal his conviction and that trial counsel failed to comply with Appellant's request to appeal his conviction.

Trial counsel was ineffective for failing to appeal the sufficiency of the evidence of the Appellant's conviction. Appellant contends that evidence presented at trial did not indicate that the Appellant committed the crime of aggravated assault.

Trial counsel was ineffective for failing to object to Ida Foltz's testimony regarding the entry of a Protection From Abuse Act Order which she secured against the Appellant.  Appellant contends that such testimony was inadmissible and tainted the truth determining process to such an extent that no reliable adjudication of guilt or innocence could have taken place.

13

VII.  ARGUMENT

    1.  THE TRIAL COURT ERRED IN FAILING TO FIND THAT TRIAL COUNSEL WAS REQUIRED TO FILE A NOTICE OF APPEAL ON BEHALF OF THE APPELLANT IN ORDER TO PROTECT THE APPELLANT'S APPEAL RIGHTS.

In reviewing a dismissal of a PCRA petition, an appellate court's scope of review is limited to determining whether the PCRA court's findings were supported by the record and its order is otherwise free from legal error.  Commonwealth v. Robinson, 452 Pa.Super. 606, 682 A.2d 831, 833 (1996).  An appellate court will not disturb the findings of the PCRA court unless they have no support in the record.  Id.

An accused has an absolute right to appeal under the Pennsylvania Constitution, Article V, §9 and counsel can be found ineffective for allowing this right to be waived unless the accused himself effectively waives the right.  Commonwealth v. Wilkerson, 490 Pa. 296, 416 A.2d 477 (1980).  Contrary to the lower court's holding, the requirement that counsel protect the appellate right of an accused extends even to circumstances where the appeal is "totally without merit."  Wilkerson at 479 (emphasis added), quoting, Commonwealth v. Perry, 464 Pa. 272, 346 A.2d 554, 555 (1975).  This is not to say that counsel must advance baseless claims in an appeal[3], rather, under such circumstances, he must protect the accused's rights through the procedure enunciated in Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

---

    [3] Indeed, doing so, would constitute unprofessional conduct. See code of Professional Responsibility, D.R. 7-102(a)(2).

14

Trial counsel testified that although believed an appeal would have been meritless, he failed to discuss this conclusion with the Appellant or even file a Notice of Appeal to protect the Appellant's appeal rights. (N.T.E.H. 48). The Appellant testified that he informed trial counsel immediately after sentencing that he wanted an appeal to be filed. (N.T.E.H. 10).

Appellant contends that pursuant to the holding in <u>Wilkerson</u>, it was incumbent upon trial counsel to protect the Appellant's appeal rights by filing a notice of appeal, at a minimum. Appellant further contends that the record indicates that the Appellant's informed trial counsel that he wanted an appeal and that trial counsel ignored his request. (N.T.E.H. 10, 48). In light of <u>Wilkerson</u> and the record in the instant case, the trial court erred in finding that trial counsel was not ineffective for failing to protect the Appellant's appeal rights.

2. <u>TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO APPEAL THE SUFFICIENCY OF THE EVIDENCE OF THE APPELLANT'S CONVICTION.</u>

To be eligible for relief under the Post Conviction Relief Act, the Appellant must prove by a preponderance of the evidence that his conviction resulted from ineffective assistance of counsel, which in the circumstances of the particular case, "...so undermined the truth-determining process that no reasonable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9534(a)(2)(ii). Ineffectiveness of counsel is established if an appellant proves that the issue underlying the claim of ineffectiveness is of arguable merit and that the course

15

chosen by counsel had no reasonable basis aimed at effectuating the appellant's interest.  If ineffectiveness is shown, in order for the court to grant the requested relief, the court must find the ineffectiveness so prejudiced the appellant's case that he did not receive a fair trial.  <u>Commonwealth v. Pierce</u>, 515 Pa. 153, 527 A.2d 973 (1987); <u>Commonwealth v. Gabrielson</u>, 370 Pa.Super. 271, 536 A.2d 401 (1988); <u>Commonwealth v. Glass</u>, 413 Pa.Super. 426, 605 A.2d 432 (1992).  Furthermore, a contention of ineffectiveness for failing to preserve insufficiency of evidence issue is cognizable under the PCRA because it raises an issue of possible innocence. <u>Commonwealth v. Perlman</u>, 392 Pa.Super 1, 572 A.2d 2, 4 (1990).

It is well established that the test of sufficiency of the evidence is whether, viewing the evidence in light most favorable to the Commonwealth as the verdict winner and drawing all proper inferences favorable to the Commonwealth, the trier of fact could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt.  <u>Commonwealth v. Jackson</u>, 506 Pa. 469, 472-73, 485 A.2d 1102, 1103 (1984), (<u>citing</u> <u>Commonwealth v. Macolino</u>, 503 Pa. 201, 206, 469 A.2d 132, 134 (1983) and <u>Commonwealth v. Keblitis</u>, 500 Pa. 321, 323, 456 A.2d 149, 150 (1983)).  If the conviction is based on inferences, suspicion or conjecture, it cannot stand. <u>Commonwealth v. Simpson</u>, 436 Pa. 459, 464, 260 A.2d 751, 754 (1970).

Appellant contends that trial counsel was ineffective for failing to appeal the sufficiency of the evidence of his conviction.  As discussed previously, Appellant contends that he

requested trial counsel to file an appeal of his conviction and trial counsel failed to honor his request.  Appellant contends that the evidence presented at trial indicated that the trier of fact could not have reasonably determined all elements of the crime of aggravated assault were to have been committed beyond a reasonable doubt.

18 Pa.C.S.A. §2702 defines aggravated assault as follows:

(a)   Offense defined - A person is guilty of aggravated assault if he:

    (1)   attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life...

    (4)   attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon.

At trial, the victim testified that he asked the Appellant a question in a threatening manner and threatened the Appellant with a lead pipe.  (N.T. 24-26).  Furthermore, Appellant's testimony indicated that at all times throughout their confrontations that the Appellant acted in self-defense.  (N.T. 101-113).

Appellant contends that trial counsel's failure to appeal the sufficiency of the evidence of his conviction so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place[4].  As a result of trial counsel's ineffectiveness, Appellant has been precluded from appellate review

---

[4]   See also, Commonwealth v. Lantzy, ___ Pa., ___, 736 A.2d 564 (1999) (where there is an unjustified failure to file a requested direct appeal, the conduct of counsel falls beneath the range of competence demanded of attorneys in criminal cases).

of his conviction.

3.   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
     OBJECT TO THE DIRECT TESTIMONY OF COMMONWEALTH WITNESS
     IDA FOLTZ THAT SHE HAD A PROTECTION FROM ABUSE
     ACT ORDER ENTERED AGAINST THE APPELLANT PRIOR TO
     THE COMMISSION OF THE UNDERLYING OFFENSE.

In general, bad character evidence is inadmissible whether by
reputation or specific acts. Commonwealth v. Smith, 240 Pa.Super.
212, 361 A.2d 862 (1976), rev'd on other grounds, 477 Pa. 424, 383
A.2d 1280 (1978). Although relevant, evidence may be excluded if
its probative value is outweighed by the danger of unfair
prejudice. Commonwealth v. Douglass, 403 Pa.Super. 105, 588 A.2d
53 (1991). Furthermore, trial counsel can be found ineffective for
failing to object to prejudicial and inadmissible testimony. See
generally, Commonwealth v. Doswell, ___ Pa. ____, 621 A.2d 104
(1993).

Appellant contends that trial counsel was ineffective for
failing to object to the direct testimony of Commonwealth witness,
Ida Foltz[5] that she had a Protection From Abuse Act Order (PFA)
entered against the Appellant prior to the commission of the
underlying offense. (N.T. 53). In addition, trial counsel was
ineffective for soliciting information on cross examination

_____

[5] Appellant notes that the trial court considered this issue
waived since it was not briefed by the Appellant in the lower
court. However, Appellant contends that the trial court instructed
the Appellant to brief only the issue of whether trial counsel was
required to file a notice of appeal to protect the Appellant's
appeal rights and not the underlying issues in his Amended
Supplemental PCRA Petition. (N.T.E.H. 62). According to the trial
court, if trial counsel was not required to file a notice of appeal
then "all" of the underlying issues in the Appellant's Amended PCRA
Petitioner would have been waived. (N.T.E.H. 5).

18

## VIII.  CONCLUSION

Wherefore, for the foregoing reasons, Appellant requests his conviction be overturned and granted a new trial.

Respectfully submitted,

By: Francis M. Socha, Esquire
2201 North Second Street
Harrisburg, PA 17110
(717) 233-4141

Attorneys for Appellant

Date:  December 3, 1999

20

regarding the P.F.A. entered against the Appellant by Ms. Foltz. (N.T. 63-64).

Appellant contends that the probative value of the existence of such an order was outweighed by the danger of unfair prejudice that the jury would assume the Appellant had violent propensities. Specifically, the entry of such an order, even if readily established, is not criminal in nature and therefore not admissible. See generally, <u>Smith</u>, <u>Id.</u> Second, the existence of such order was not relevant to the instant case since the victim was <u>not</u> the party who had a P.F.A. order against the Appellant.

Thus, trial counsel could have had no reasonable basis for not objecting to said statement since it implied to the jury that the Appellant had a violent propensity or else a P.F.A. would not have been entered against him. Also, the admission of such testimony inflamed the jury into believing that since the Appellant has a violent propensity he must be guilty of aggravated assault.

Accordingly, the Appellant suggests that trial counsel was ineffective for failing to object to the admission and cross-examination eliciting such irrelevant and prejudicial testimony. Such information clearly prejudiced the Appellant and adversely affected the truth determining process of his trial.

19

*Socha*

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
: DAUPHIIN COUNTY, PENNSYLVANIA
:
VS. : NO. 1173 C.D. 1995
:
:
JOHN FLEMING[1], a/k/a Joe King : POST CONVICTION RELIEF ACT

---

## OPINION

The matter for our disposition is defendant John Fleming's (hereinafter "Fleming") petition for collateral relief under the Post Conviction Relief Act ("PCRA"). Fleming was convicted by a jury of aggravated assault on March 12, 1996, and, on May 16, 1996, was sentenced to a prison term of eight to twenty years. Michael Duda, Esquire, of the Dauphin County Public Defender's Office, represented Fleming at trial.

Prior to being sentenced, Fleming filed an untimely PCRA petition on May 13, 1996, pro se, which was denied by this court on May 14, 1996. No direct appeal was filed. On November 5, 1998, Fleming filed a petition for allowance of a _nunc pro tunc_ appeal which was denied by this court on November 12, 1998. We did, however, appoint Francis M. Socha, Esquire to represent Fleming on his PCRA petition.

Fleming, through attorney Socha, filed a supplemental PCRA petition on December 15, 1998, which was answered by the commonwealth

---

[1] We note that various pleadings spell petitioner's name with a double "m." The correct spelling, which we adopt in our opinion, is "Fleming."

on January 14, 1999. Presently before us is Fleming's amended

supplemental PCRA petition which was filed on February 18, 1999. The

court has received supporting briefs from both parties and conducted an

evidentiary hearing on April 23, 1999.

In his amended supplemental PCRA petition, Fleming alleges

two errors:

> 1.  Trial counsel was ineffective for failing to appeal the sufficiency of the evidence of Fleming's conviction;
>
> 2.  Trial counsel was ineffective for failing to object to the direct testimony of a commonwealth witness.

We begin by addressing the second of the two issues stated

above. Petitioner's brief contains no argument heading or discussion

regarding a failure of trial counsel to object to the testimony of

commonwealth witness Ida Foltz. Accordingly, we deem this issue

abandoned. See, e.g., Commonwealth v. Perry, 420 A.2d 729 (Pa. Super.

1980); Commonwealth v. Dessus, 396 A.2d 1254 (Pa. Super. 1978).

We turn then to the claim of trial counsel's ineffectiveness for

failing to file an appeal. At the April 23, 1999 evidentiary hearing, petitioner

testified that he advised trial counsel of his desire to appeal on two

occasions. First, he claims to have made the request immediately after the

verdict was rendered on March 12, 1996; and again, he claims to have made

the same request following sentencing on May 16, 1996. He also claims

that Mr. Duda promised to come see him in prison, but never did so. It was only much later, after several inquiries, that Fleming discovered that no appeal was ever taken.

Michael Duda testified that he had been an assistant public defender for eight years. He had no recollection of any requests by Fleming regarding an appeal. Duda agrees that, following sentencing, he had no personal contact with petitioner. His file did reflect a written request from Fleming on August 22, 1996, for a copy of his transcript, which was provided by mail on August 28, 1996. There was also a March 23, 1998 letter to the chief public defender in which Fleming inquires if an appeal is going to be taken.

Mr. Duda testified that, regardless of any requests or discussion with his client, he would have filed a direct appeal if he believed there was a meritorious claim. In this case he found there to be no appealable issue.

It is well settled that a defendant controls several aspects of his representation, including his direct appeal.

> It is beyond cavil that a defendant has an absolute right to appeal, Pa. Const. art. V, sec. 9, and the ultimate decision of whether to do so must be made by the defendant and not counsel. (Citations omitted). At the same time, it is well settled that a defendant may waive the right to appeal, provided such waiver is a "knowing and intelligent" act on the part of a defendant. (Citation omitted).

Commonwealth v. Dosch, 501 A.2d 667, 670 (Pa. Super. 1985) citing

Commonwealth v. Stokes, 440 A.2d 591 (Pa. Super 1982). "[I]t is both the

right and the responsibility of the defendant to determine whether a direct

3

appeal should be taken." <u>Commonwealth v. Johnson</u>, 512 A.2d 1242, 1249 (Pa. Super. 1986) (emphasis in original).

On the other hand, trial counsel has no duty—as petitioner seems to suggest—to automatically file a notice of appeal in every case simply to protect and perfect a defendant's appellate rights. To the contrary, an attorney has a legal and ethical duty to avoid a frivolous appeal. PA. R. APP. P. 2744; <u>Jones v. Barnes</u>, 463 U.S. 745, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983); <u>Commonwealth v. Rauser</u>, 532 A.2d 1191 (Pa. Super. 1987). Where trial counsel is faced with a request to appeal by a client and believes there are no meritorious issues for appeal, counsel should petition the court to withdraw from the case. <u>Commonwealth v. McClendon</u>, 495 Pa. 467, 434 A.2d 1185 (1981); <u>Commonwealth v. Smith</u>, 700 A.2d 1301 (Pa. Super. 1997).

Here, PCRA counsel has directed our attention to several cases, e.g., <u>Commonwealth v. Keys</u>, 580 A.2d 386 (Pa. Super. 1990), which address trial counsel's responsibility to preserve a client's appellate rights while seeking to withdraw representation. These cases are not particularly helpful since Mr. Duda makes no claim that he was seeking to withdraw or that he was not counsel of record during the period for taking an appeal.

We are left simply with the issue as to whether Fleming's assertion that he asked Mr. Duda to appeal is credible. We find that it is not. Michael Duda was, at the time of Fleming's trial and sentencing, an experienced public defender. He was fully acquainted with the appellate

4

process and his client's rights regarding same.  We believe, as Attorney

Duda has testified, that, had Fleming requested an appeal, one would have

been taken.  Accordingly, we conclude that Attorney Duda did not render

ineffective assistance of counsel to petitioner.

We enter the following:

### ORDER

AND NOW, this 16th day of July, 1999, after consideration of

defendant John Fleming, a/k/a Joe King's petition under the Post Conviction

Relief Act, and after consideration of testimony heard at an evidentiary

hearing, defendant's petition is hereby DENIED.

BY THE COURT:

_____
Joseph H. Kleinfelter, Judge

RECEIVED

JUL 1 9 199

CLERK OF COURT
DAUPHIN COUN

Distribution:

Francis M. Socha, Esquire, 2201 North Second Street, Harrisburg, PA
      17110
John Fleming, CZ-9499, E-1, P.O. Box 256, Waymart, PA  18472-0256
Jeffrey B. Engle, Esquire, District Attorney's Office

**APPENDIX "D"**

J. S14010/00

**AFFIRMED**

COMMONWEALTH OF PENNSYLVANIA,  :    IN THE SUPERIOR COURT OF
        Appellee    :    PENNSYLVANIA

      v.    :

**RECEIVED**
APR 2 8 2000
DISTRICT ATTORNEY'S
OFFICE
DAUPHIN COUNTY

JOHN FLEMMING, A/K/A JOE KING,  :
        Appellant    :    No. 1301 MDA 1999

Appeal from the Order Entered July 16, 1999, in the Court
of Common Pleas of Dauphin County,
Criminal Division, at No. 1173 CD 1995.

BEFORE: JOHNSON, TODD and HESTER, JJ.

MEMORANDUM:

**F I L E D** APR 2 7 2000

John Flemming,[1] a/k/a Joe King, appeals from the July 16, 1999 order

denying his request for post-conviction relief. We affirm.

The following facts are pertinent. On January 31, 1995, during a

confrontation, Appellant assaulted Gary Null, a male acquaintance of his

former girlfriend, Ida Foltz. Appellant struck his victim several times with a

twenty-four-inch-long pipe, breaking the victim's left arm and causing

several bruises and contusions to the victim's left leg. Appellant was

charged with one count of aggravated assault. On March 12, 1996, a jury

convicted Appellant as charged.[2]

---

[1] We note that the record contains two spellings for Appellant's last name: "Flemming" and "Fleming."

[2] On March 11, 1996, prior to proceeding to trial on the aggravated assault charge, Appellant entered a guilty plea to the charge of simple assault. This charge was related to an encounter between Appellant and Mr. Null that occurred weeks after the attack with the pipe. Appellant's guilty plea is not the subject of this appeal.

J. S14010/00

On May 13, 1996, Appellant filed a *pro se* PCRA petition.  The court dismissed it on May 14, 1996, since Appellant had filed it before sentencing. Thereafter, on May 16, 1996, Appellant was sentenced to consecutive terms of eight to twenty years imprisonment for aggravated assault and one to two years imprisonment for simple assault, for a total of nine to twenty-one years imprisonment with credit for time served.  No direct appeal was taken. However, on November 5, 1998, Appellant filed a petition for allowance of appeal *nunc pro tunc.*  The trial court denied the petition on November 12, 1998, but appointed PCRA counsel to aid Appellant in pursuing post-conviction relief.

On December 15, 1998, Appellant filed a supplemental PCRA petition. Thereafter, Appellant filed a supplemental amended PCRA petition on February 18, 1999, in which he alleged ineffective assistance of trial counsel for failing to file a direct appeal and for failing to object to the direct testimony of Commonwealth witnesses Ida Foltz.[3]

At the April 23, 1999 evidentiary hearing held to investigate the issues, Appellant's trial counsel, Michael Duda, denied Appellant's accusation regarding his lack of contact with his client before trial.  Mr. Duda told the court that he met with Appellant several times prior to trial and

---

[3]  In his petition, Appellant alleged trial counsel was ineffective for failing to object to Ms. Foltz's testimony regarding a protection from abuse order ("PFA") that she had obtained against Appellant.

J. S14010/00

thought that he had a working relationship with his client.  After trial, Mr. Duda testified that Appellant never contacted him and never requested a direct appeal.  Mr. Duda testified that he had been a public defender for eight years and if Appellant had requested an appeal, he would have filed one, even after concluding that there were no meritorious claims.  Moreover, trial counsel testified that, as a matter of practice, he conducts an independent review of his cases and would have filed an appeal even if Appellant had not asked as long as he thought there were viable issues for appeal.

Mr. Duda told the court that his file contained one letter, dated August 22, 1996, that Appellant had sent him from Camp Hill, wherein he requested counsel's assistance in obtaining trial transcripts.  Counsel responded.  The next prison correspondence that was in Mr. Duda's file was a letter Appellant had sent to the Chief Public Defender, who then forwarded it to Mr. Duda.  The letter was not dated, but the envelope was postmarked March 23, 1998.  In the letter, Appellant charged that Mr. Duda had violated Appellant's direct appeal rights and inquired as to whether an appeal would be filed on his behalf.

Next, PCRA counsel questioned Mr. Duda regarding his trial tactics concerning Commonwealth witness Ida Foltz.  PCRA counsel suggested Mr. Duda should have objected to the testimony of Ms. Foltz regarding the PFA.  Mr. Duda explained that the Commonwealth had called Ms. Foltz to the

J. S14010/00

stand since she had witnessed the assault against the victim.  Ms. Foltz and Appellant had been in a relationship at one time, but Ms. Foltz had ended it before the assault.   Appellant actively was pursuing Ms. Foltz against her wishes when the victim attempted to intervene.   Mr. Duda recalled that when the prosecutor asked Ms. Foltz about her relationship with Appellant, she blurted out that she had a PFA order entered against him.  Mr. Duda noted that the prosecutor had not tried to elicit the response.   Since the prosecutor did not further pursue that line of inquiry, Mr. Duda decided not to object to the answer for fear that he would call undue attention to it. However, he sensed the victim's great hostility toward his client and feared the jurors might also.  Therefore, during his cross-examination of Ms. Foltz, trial counsel decided to clarify the time period when the PFA was in force. The witness replied that there was no PFA order against Appellant at the time of the incident, and counsel moved on to another issue.

Conversely, Appellant testified that immediately after the jury's finding of guilt, he asked trial counsel to file an appeal.  Further, Appellant claimed that he had a telephone discussion with Mr. Duda, which occurred in September, 1996, in which he inquired as to the status of his direct appeal. During cross-examination, Appellant acknowledged that in the first *pro se* PCRA petition which he filed prior to sentencing, he had stated that he wanted to sue his trial counsel and have him removed from his case.[4]

---

[4]  Trial counsel testified that he was not aware of this.

- 4 -

J. S14010/00

At the conclusion of all testimony, the court noted that while a defendant has an absolute right to appeal, the ultimate decision of whether to proceed with an appeal belongs to the defendant, not his attorney. ***See Commonwealth v. Dosch***, 501 A.2d 667 (Pa.Super. 1985). Further, the court noted that a defendant has the affirmative right and responsibility to determine whether to take an appeal. ***Commonwealth v. Johnson***, 512 A.2d 1242 (Pa.Super. 1986). Moreover, the court noted that trial counsel has no affirmative duty "to automatically file a notice of appeal in every case simply to protect and perfect a defendant's appellate rights. To the contrary, an attorney has a legal and ethical duty to avoid a frivolous appeal." Trial Court Opinion, 7/16/99, at 4.

The court did not find credible Appellant's testimony that he had asked trial counsel to file an appeal. Rather, it credited trial counsel's testimony that he would have filed an appeal if Appellant had made the request. The court deemed to be abandoned Appellant's ineffectiveness claim regarding trial counsel's failure to object to Ida Foltz's testimony since PCRA counsel failed to include argument on this issue.[5] Accordingly, the court denied Appellant's PCRA petition. This appeal followed.

Appellant presents the following issues on appeal.

---

[5] PCRA counsel excuses his failure to include argument on this issue with his contention that the trial court directed him to brief only the issue regarding trial counsel's failure to file an appeal. While we find no support in the record for this directive, we will address this claim notwithstanding.

J. S14010/00

    1.    Did the trial court err in failing to find that trial counsel was required to file a notice of appeal on behalf of the Appellant in order to protect the Appellant's appeal rights?

    2.    Was trial counsel ineffective for failing to appeal the sufficiency of the evidence of the Appellant's conviction?

    3.    Was trial counsel ineffective for failing to object to the direct testimony of Commonwealth witness Ida Foltz that she has a protection from abuse order entered against the Appellant prior to the commission of the underlying offense?

Appellant's brief at 12.

We may raise issues of appealability, *sua sponte,* since such questions implicate the jurisdiction of this Court. **Commonwealth v. Borrero**, 692 A.2d 158 (Pa.Super. 1997). Preliminarily, we note that Appellant's PCRA petition was filed November 5, 1998, more than two years after Appellant's judgment of sentence became final. Pursuant to 42 Pa.C.S. § 9545, a PCRA petition must be filed within one year of the date the judgment of sentence becomes final, with the exception of three circumstances. These exceptions include an assertion that there was: interference by government officials in the presentation of the claim; after-discovered facts or evidence upon which the claim is predicated were unknown to petitioner; and an after-recognized constitutional right. **See** 42 Pa.C.S. § 9545(b)(1)(i)-(iii). Herein, in Appellant's amended supplemental petition, filed February 18, 1999, he advances the assertion that his lack of knowledge that his trial counsel failed to file a direct appeal upon request constitutes after-discovered facts under 42 Pa.C.S. § 9545(b)(1)(ii). We disagree.

- 6 -

J. S14010/00

Whether counsel filed an appeal was a fact that readily was discoverable by Appellant. Our Supreme Court has held that if the facts forming the request for PCRA relief were discoverable at the time of the trial proceedings, a defendant's "new discovery" of those facts does not come within the exceptions to the filing requirements of 42 Pa.C.S. § 9545. **Commonwealth v. Cross**, 555 Pa. 603, 726 A.2d 333 (1999); **see also Commonwealth v. Perry**, 716 A.2d 1259 (Pa.Super. 1998) (a defendant's "new discovery" of existing case law does not fall within any exception to the filing requirements). Appellant easily could have ascertained whether trial counsel filed an appeal for him. There were no "new" facts to discover; there was a failure to discover existing facts. Hence, the exception does not apply. As the petition was not timely filed, PCRA relief properly was denied.

Order affirmed.

Judgment Entered.

Prothonotary

APR 27 2000

Date:_____

- 7 -